UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANKFURT-TRUST INVESTMENT LUXEMBURG AG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED TECHNOLOGIES CORPORATION, GREGORY J. HAYES, AKHIL JOHRI, ALAIN M. BELLEMARE, DAVID GITLIN, AND GERAUD DARNIS<br><br>Defendants. | Civil Case No. 17-CV-03570-JGK<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 7

III. THE PARTIES ..... 8

A. Lead Plaintiff ..... 8

B. Defendants ..... 8

IV. SUBSTANTIVE ALLEGATIONS ..... 11

A. Company Background ..... 11

B. UTAS Commercial Aftermarket Sales Deteriorate Prior to the Start of the Class Period ..... 13

i. Commercial Primes Began Stockpiling and Selling Parts Directly to Airlines ..... 14

ii. Boeing's "Partnering for Success" Program Forces UTC to Take an Average 15% Price Cut on Parts Sales ..... 15

iii. Airline Collectives Pooled Their Purchasing Power for Replacement Parts ..... 16

iv. Airlines Increasingly Purchase Counterfeit Parts ..... 17

C. UTC/UTAS Management Were Aware of the Matters Adversely Affecting Commercial Aftermarket Sales ..... 18

D. UTC/UTAS Management Reject Efforts to Incorporate Declining Commercial Aftermarket Sales into their Guidance and Impose Unrealistic Targets on the Business Units ..... 19

E. UTAS Historically Relied Upon the Undisclosed Practice of Pulling-in Sales to Meet Earnings Targets ..... 26

F. Defendant Hayes Becomes CEO and Market Participants Expect Conservative Guidance ..... 28

G. UTC Issues Unrealistic Guidance That Defendants Failed to Validate ..... 34

H. Management Knew or Recklessly Disregarded That UTAS Commercial Aftermarket Sales Failed to Meet Forecasts ..... 35

I. The Truth Begins to Be Revealed ..... 37

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 39

A. 2014 Annual Investor and Analyst Meeting ..... 39

B. Fourth Quarter 2014 Earnings Call ..... 46

C. February 18, 2015 Barclays' Industrial Select Conference .................................. 49

D. 2015 Annual Investor and Analyst Meeting ........................................................ 50

E. March 18, 2015 Bank of America Merrill Lynch Global Industrials Conference ................................................................................................ 54

F. First Quarter 2015 Earnings Call ........................................................................... 56

G. May 19, 2015 Electrical Products Group Conference ......................................... 60

H. June 4, 2015 Deutsche Bank Global Industrials and Basic Metals Conference ... 61

I. June 15, 2015 Paris Air Show Analysts and Portfolio Managers Meeting........... 63

VI. LOSS CAUSATION.................................................................................................. 65

VII. ADDITIONAL ALLEGATIONS OF SCIENTER......................................................... 70

A. Defendants' Responsibility for the Erroneous Forecasts..................................... 71

B. Defendants' Receipt of and/or Access to Information Undermining the Unreasonable Financial Guidance ........................................... 71

C. Defendants' Admissions Support a Strong Inference of Scienter ....................... 74

D. Core Operations ...................................................................................................... 75

VIII. PRESUMPTION OF RELIANCE .............................................................................. 77

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ............................................................................................ 79

X. CLASS ACTION ALLEGATIONS ............................................................................ 82

XI. CLAIMS FOR RELIEF UNDER EXCHANGE ACT .................................................. 84

A. FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS) ...................................................................................................... 84

B. FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST THE INDIVIDUAL DEFENDANTS)............................................. 88

XII. PRAYER FOR RELIEF ............................................................................................. 90

XIII. JURY TRIAL DEMANDED....................................................................................... 90

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| AMFMS | Air Data, MEMs and Flight Management Systems |
| BD&E | Business Development & Engineering |
| BD&S | Business Development & Strategy |
| BIS | UTC Building & Industrial Systems |
| DRSS | De-Icing, Rescue & Specialty Systems |
| FP&A | Financial Planning & Analysis |
| ICAMS | Inertial, Control & Aircraft Management Systems |
| Kidde | Kidde Aerospace & Defense Systems |
| MRO | Maintenance, Repair & Overhaul |
| Otis | Otis Elevator Company |
| PAS | UTC Propulsion & Aerospace Systems |
| PC&S | Power, Controls & Sensor Systems |
| PFS | Partnering for Success |
| SIS | Sensors & Integrated Systems |
| UTAS | UTC Aerospace Systems |
| UTC | United Technologies Corporation |

Except as to allegations specifically pertaining to Lead Plaintiff, all allegations herein are based upon the ongoing independent investigation undertaken by Court-appointed Lead Counsel, Kessler Topaz Meltzer & Check, LLP, and Court-appointed Liaison Counsel, Labaton Sucharow LLP, which included, among other things, a review and analysis of: (i) public filings by United Technologies Corporation ("UTC" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) transcripts of investor calls and conferences with UTC senior management; (v) interviews with former UTC employees; and (vi) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting Lead Plaintiff's allegations are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Lead Plaintiff Kapitalforeningen Lægernes Invest ("KLI"), by and through its undersigned attorneys, brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, on behalf of itself and all other persons or entities who purchased or otherwise acquired UTC common stock between December 11, 2014 and July 20, 2015, inclusive (the "Class Period").

2. This case arises from a series of materially false and misleading statements and material omissions made by UTC and its senior-most officers regarding the Company's purportedly robust operating condition and growth prospects—as expressed through positive financial guidance and statements confirming that the Company was on-track to meet such

guidance throughout the Class Period. In reality, as Defendants admitted at the end of the Class Period: (i) the guidance was "overly optimistic" and "way too aggressive"; (ii) they pushed the business units to meet particular goals, without having adequately vetted the assumptions underlying how the business units were going to meet these goals; and (iii) there was never a "strong basis" in the assumptions underlying their targets. In addition, Defendants' statements were materially misleading in light of their failure to disclose known, adverse trends affecting UTAS's commercial aftermarket sales, which were compounded by UTC Aerospace Systems' ("UTAS") reliance on "pulling in" sales – the unsustainable practice of bringing into the current period sales that are scheduled to occur in future periods, a slowing Chinese real estate and construction market that adversely affected Otis' sales growth there, and an order backlog at Otis China that consisted of false or fake, and specially approved orders that were unlikely to convert into future sales.

3. Defendants' campaign to mislead investors as to UTC's business condition and future prospects began shortly after what analysts described as the "abrupt" departure of long-time UTC CEO Louis Chenevert ("Chenevert") and his replacement by Defendant Gregory J. Hayes ("Hayes"). While expressing some concern over the lack of clarity that Chenevert's sudden departure brought, analysts were optimistic and specifically highlighted Defendant Hayes' reputation for being a "straight-shooter" with the investing community and a "realist who borders on the pessimistic," who had purportedly done a good job recently "rebasing expectations" for next year's earnings.

4. On December 11, 2014, in one of Defendant Hayes' first public acts after replacing Chenevert as CEO, UTC issued EPS guidance for FY2015 of $7.00 to $7.20 per share, based in part on the "***high single digit***" growth in the Company's projected commercial

aftermarket sales for UTAS, the aerospace business unit UTC launched in 2012 and "10% revenue growth in China," the majority of which came from UTC's Otis Elevator Company ("Otis") unit, the world's largest manufacturer and maintainer of people-moving products.

5. Analysts seized upon these representations and, in light of Defendant Hayes' perceived credibility, even noted that the FY2015 guidance was likely conservative. For example, Sterne Agee analysts stated that the "2015 EPS range is $7.00-$7.20, which was slightly below expectations given [that] new ***CEO Greg Hayes likely erred more on the low end*** to build on new track record." Indeed, as a result of Hayes' new leadership, analysts believed that "the company is in good hands," that Hayes "***clearly examine[d] the assumptions of the [C]ompany's operating units***" and that UTC's leadership would be "more collaborative."

6. On January 26, 2015, Defendants revised slightly UTC's 2015 EPS guidance to $6.85 to $7.05 to account for the strengthening of the U.S. dollar and pension discount rate headwinds. However, Defendants confirmed that "***business fundamentals and operational expectations have not changed***," and reaffirmed the Company's previously-issued EPS guidance for its core operations. In making these representations, Defendants falsely signaled to the market that the Company was otherwise on-track to meet its guidance. For example, one analyst noted that "the company stressed that the lower guidance was due ***entirely*** to FX translation and see the base business on track with the December plan," while another observed that "there were no adverse changes in underlying business trends since the December guidance meeting and the organic growth outlook is intact."

7. Between January and June 2015, Defendants reaffirmed this revised guidance on ***multiple*** occasions. Each affirmation falsely assured investors that the Company was performing in line with expectations, such that UTC continued to be on track to meet its EPS goal. Indeed,

Defendants touted the Company's underlying business fundamentals as "strong" and affirmatively represented that it was "on the right track" to meet the FY2015 earnings guidance, while at the same time professing their confidence in UTC's ability to meet these numbers. As late as June 4, 2015, Defendants stated that we "***still feel good about where we are on the outlook for organic growth for the current year***," and that there was "***no change***" in the "***guidance for the year . . . $6.85 to $7.05 for earnings per share***," thus confirming again that the Company was performing in line with expectations and that UTC remained on track to deliver earnings as forecast.

8. Contrary to these representations, and as Defendants admitted at the end of the Class Period, UTC's FY2015 EPS guidance was "***overly optimistic***" and "***way too aggressive***" from the start, and was premised upon growth assumptions that lacked "***a strong basis***" in fact. For example, in 2013 and 2014, commercial aftermarket sales within a key segment of UTAS's Sensors and Integrated Systems business unit ("SIS") were down by approximately 40-50%. Factors contributing to this decline included: (i) commercial aircraft makers (commonly referred to in the industry as "commercial primes") stockpiling and selling their own spare parts; (ii) Boeing's Partnership for Success ("PFS") initiative, which effectively strong-armed suppliers like UTC to accept massive price concessions of approximately 15-25% on their sales to Boeing; (iii) airlines forming collectives to improve their purchasing power; and (iv) the existence of counterfeit parts in the marketplace. Similarly, despite a significant slowdown in the Chinese real estate and construction markets prior to and during the Class Period, and significant pricing pressure on Otis, Defendants issued guidance predicated upon the "hop[e]" for a market recovery.

9. Defendants knew of these trends at the time they issued and repeatedly reaffirmed UTC's annual EPS guidance—what one analyst described as "water torture on [] guidance." Specifically, Defendants were briefed at least monthly regarding these matters and were presented with forecasts for business units that accounted for these conditions in their numbers (which were described as "stretch" goals). Despite this knowledge, Defendants rejected these plans and instead imposed wholly "unrealistic" targets on business units, which former employees described as being "beyond the test of reasonableness" and having "zero" chance of being met. For example, Defendants' targets required one business unit to increase its earnings before interest and taxes ("EBIT") by an additional $20 million, which resulted in certain sales targets within that business unit being increased by 30-35% for FY2015.

10. Defendants' false and misleading statements caused UTC's common stock to trade at artificially-inflated prices throughout the Class Period, reaching a Class Period high of $124.11 per share.

11. The truth regarding Defendants' fraud was partially revealed to investors on June 15, 2015, during a presentation by UTC executives at the Paris Air Show. During the presentation, UTC announced its intention to divest its interests in Sikorsky Aircraft Corporation ("Sikorsky"), which manufactured military and commercial helicopters and provided aftermarket helicopter and aircraft parts and services, and adjusted its FY2015 guidance downward from $6.85 to $7.05 to $6.35 to $6.55 per share to reflect the divestiture. In addition, Defendants acknowledged "some pressure on Otis," and disclosed to investors that UTAS would ***not*** meet the "high single digit" growth targets incorporated into UTC's FY2015 guidance. However, Defendants continued to mislead investors (and thus prevented the full truth from being

revealed) by reaffirming UTC's overall EPS guidance (excluding Sikorsky) and assuring investors that UTC was still on track to meet ***at least*** the low end of the EPS guidance.

12. Following Defendants' disclosures at the Paris Air Show, UTC's common stock price declined a total of 2.5%, falling from its closing price of $117.60 on Friday, June 12, 2015, to close at $114.61 per share on Monday, July 15, 2015, damaging class members.

13. On July 21, 2015—less than a month after affirming the Company's core operational guidance (as adjusted) at the Paris Air Show—Defendants' fraud was fully laid bare. On that day, Defendants slashed UTC's 2015 guidance to $6.15 to $6.30 per share and admitted that: (i) the original guidance announced in December 2014 was "overly optimistic" and "way too aggressive" from the start; (ii) the assumptions used to generate the EPS guidance did not have a "strong basis" in fact; and (iii) Defendants did not "delve[] deep enough into" or "question enough" the bases for the assumptions underlying the forecasts before communicating UTC's guidance to investors. Specifically, Defendant Hayes admitted that UTC's FY2015 earnings guidance was fraudulently overstated because they had "push[ed] the [UTAS commercial] aftermarket guys to deliver a much bigger number" than they could realistically attain, and at the same time did not "delve[] deep enough into" or "question enough the assumptions underlying how they were going to get there."

14. Following this disclosure, the Company's stock price dropped an additional $7.77 per share, or roughly 7%, to close at $102.71 per share on July 21, 2015, damaging class members. Analysts were stunned, noting that the guidance revision was a "big negative" and "more than a major surprise." Analysts also repeatedly questioned why UTC had not lowered its guidance earlier, commenting that investors are likely to "question the ability of UTC to

accurately forecast results" and have "less faith in management's forecasts," and admonishing Defendants that "hope is not a strategy."

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

16. This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in this District. UTC transacts business in this District, and the Company's stock trades in this District on the New York Stock Exchange ("NYSE"). Moreover, several of the alleged misstatements and omissions were made in this District on behalf of UTC, by the Individual Defendants, including:

a. the December 11, 2014 Shareholder/Analyst Call (*see* ¶¶ 107-120) during which Defendants Hayes, Alain M. Bellemare ("Bellemare") and Geraud Darnis ("Darnis"), speaking on behalf of UTC, made the misrepresentations and omissions alleged herein, was held at the Asia Society in New York City; and

b. the March 12, 2015 Shareholder/Analyst Call (*see* ¶¶ 136-146) during which Defendants David Gitlin ("Gitlin") and Darnis made the misrepresentations and omissions alleged herein, was held at the Plaza Hotel in New York City.

18. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. THE PARTIES

### A. Lead Plaintiff

19. Court-appointed Lead Plaintiff Kapitalforeningen Lægernes Invest is a Danish association that invests billions of dollars of pension assets on behalf of medical doctors in Denmark. KLI purchased shares of UTC common stock at artificially inflated prices during the Class Period, as set forth in the certification dated November 8, 2017, that was previously filed in this litigation and is attached hereto as Exhibit A.

### B. Defendants

20. Defendant UTC was incorporated in Delaware in 1934 and provides high technology products and services to the building systems and aerospace industries worldwide. UTC's corporate headquarters are located in Hartford, Connecticut and its common stock trades on the NYSE under the ticker symbol "UTX."

21. Defendant Hayes has served as President and Chief Executive Officer of UTC since November 23, 2014. Prior to that, he served as Senior Vice President and Chief Financial Officer of UTC from September 2008 through November 2014. Hayes began his career at UTC in 1999 in its Hamilton Sundstrand business, and served as Vice President of various areas prior to being named CFO.

22. Defendant Johri was Senior Vice President and Chief Financial Officer of UTC during the majority of the Class Period. Johri had a 26-year tenure at UTC, serving in various executive positions, including Vice President of Finance and CFO of UTC's Propulsion & Aerospace Systems ("PAS") organization, before being appointed CFO of Pall Corporation in

May 1, 2013. He returned to UTC as CFO in January 2015 and continues to serve in that position.

23. Defendant Bellemare was the President and CEO of PAS from the start of the Class Period until January 2015, when UTC announced it was "streamlin[ing] its aerospace organization and leadership structure" by "eliminating the PAS organization."

24. Defendant Gitlin was the President of UTAS during the majority of the Class Period. Gitlin began his tenure at UTC in 1997 and held various leadership positions in legal business development, program management and customer service. Gitlin led the integration of Goodrich with UTC to form UTAS, and served as Senior Vice President of UTAS's Aircraft Systems segment since UTAS's launch in 2012. On September 12, 2013, Gitlin was named President of UTAS's Aircraft Systems segment, and reported directly to Defendant Bellemare until January 2015 when he was named President of UTAS, reporting to Defendant Hayes, and continues to serve in that position.

25. Defendant Geraud Darnis was the President of UTC's Building & Industrial Systems ("BIS") organization throughout the Class Period. Darnis began his 32-year career with UTC in 1983 at Otis and was the President of UTC's Climate, Controls & Security ("CCS") business before being appointed President of BIS (comprised of Otis and CCS). On July 27, 2015, on the heels of announcing its inability to meet earnings guidance, UTC announced Darnis' sudden and unexpected retirement.

26. Defendants Hayes, Johri, Bellemare, Gitlin, and Darnis are collectively referred to as the "Individual Defendants."

27. Each of the Individual Defendants, by virtue of his high-level position with UTC, directly participated in the management of the Company, was directly involved in the day-to-day

operations of the Company at the highest levels, and was privy to confidential and proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his respective tenure with the Company, as alleged herein. As alleged below, the materially false or misleading information and the material omissions conveyed to the public resulted from the collective actions of the Individual Defendants. Each of these individuals during his tenure with the Company was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, and knew or recklessly disregarded that these statements were being issued regarding the Company.

28. As executive officers of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded common stock would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

29. Each of the Individual Defendants, because of his position of control and authority as an executive officer of UTC, was able to and did control the content of the Company's SEC filings, press releases, and other public statements that UTC issued during the Class Period, was provided with copies of the statements at issue in this action before they were made to the public, and had the ability to prevent their issuance or cause them to be corrected.

Accordingly, each of the Individual Defendants is responsible for the accuracy of the materially false or misleading public statements alleged herein.

30. Each of the Individual Defendants, because of his position of control and authority as an executive officer of UTC, had access to the adverse undisclosed information alleged herein about UTC's business, operations, and financial statements, through access to internal corporate documents, conversations with other UTC officers and employees, attendance at UTC management meetings, and via reports and other information received in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the representations made by or about UTC materially false or misleading.

31. Each of the Individual Defendants is liable as a participant in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of UTC common stock during the Class Period by disseminating materially false or misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding UTC's business, operations, growth prospects, and management, and the value of UTC common stock; and (ii) caused Lead Plaintiff and members of the Class to acquire UTC common stock at artificially inflated prices during the Class Period.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Company Background

32. UTC is a global provider of high technology products and services to the buildings systems and aerospace industries. During the Class Period, its operations were classified into five principal business and financial reporting segments: (i) UTAS; (ii) Otis; (iii) CCS; (iv) Pratt & Whitney; and (v) Sikorsky. In 2014 and 2015 respectively, UTAS accounted for $14.215 billion (24.55%) and $14.094 billion (25.12%) of UTC's consolidated net sales, and $2.355 billion (24.55%) and $1.888 billion (25.89%) in operating profits (excluding Sikorsky).

In 2014 and 2015, respectively, Otis accounted for $12.982 billion (22.42%) and $11.980 billion (21.36%) of UTC's consolidated net sales, and $2.640 billion (27.52%) and $2.338 billion (32.07%) in operating profits (excluding Sikorsky).

33. UTAS is a leading global provider of technologically advanced aerospace products and aftermarket service solutions for aircraft manufacturers, airlines, regional, business and general aviation markets, military, space and undersea operations. At the start of the Class Period, UTAS was organized into two main business segments: (i) Aircraft Systems, led by Defendant Gitlin; and (ii) Power, Controls & Sensing Systems ("PC&S"), led by Michael R. Dumais ("Dumais"). Defendant Gitlin and Dumais each reported to Defendant Bellemare, President and CEO of PAS until he left in January 2015 after UTC disbanded PAS. In connection with this organizational change, UTC also consolidated the Aircraft Systems and PC&S segments under a single leadership and named Defendant Gitlin President of UTAS. In this role, Defendant Gitlin reported directly to UTC CEO, Defendant Hayes.

34. Otis is the world's largest elevator and escalator manufacturing, installation and services company. It designs, manufactures, sells and installs passenger and freight elevators for low-, medium- and high-speed applications, as well as a broad line of escalators and moving walkways. In addition to new equipment, Otis provides modernization products to upgrade elevators and escalators as well as maintenance and repair services for both its products and those of other manufacturers. Otis serves customers in the commercial and residential property industries around the world and sells directly to the end customer and through sales representatives and distributors. Otis primarily earns revenues from: (i) current-period sales; (ii) the conversion of backlog sales into revenues; and (iii) the provision of aftermarket services. Current-period sales reflect new orders placed and paid for during the reporting period. Backlog

reflects orders which were placed in a particular period, but for which the customer has not yet made full payment.

**B. UTAS Commercial Aftermarket Sales Deteriorate Prior to the Start of the Class Period**

35. As alleged in detail below, prior to the start of the Class Period, UTAS experienced significant declines in commercial aftermarket sales that adversely impacted UTC's earnings and growth prospects for FY2015.

36. Former Employee ("FE") 1 came to UTAS through UTC's acquisition of Goodrich and was a senior executive in Inertial, Control & Aircraft Management Systems ("ICAMS") – a segment of UTAS's SIS business – from approximately January 2013 through May 2015. During the Class Period, FE 1 reported to SIS Vice President of Business Development Brian Sartain ("Sartain"), who reported to SIS President Justin Keppy ("Keppy"). Keppy, in turn, reported to UTAS PC&S President Dumais, who reported to PAS President Defendant Bellemare (until January 2015, when he began reporting to the newly appointed UTAS President, Defendant Gitlin) who reported to Defendant Hayes.

37. FE 1 was involved in preparing sales and profits projections for SIS's ICAMS segment throughout his tenure. FE 1 would aggregate the forecasts for his[1] department with those of the other ICAMS areas for presentation to Sartain and Keppy. As a result, FE 1 was privy to the aggregate monthly forecasts for ICAMS.

38. According to FE 1, during the 2013-2014 time period, the UTAS commercial aftermarket business had deteriorated significantly. Specifically, FE 1 recalls that ICAMS's internal numbers reflected that commercial aftermarket sales were off-pace by approximately 40-50% in 2013 and 2014, compared to pre-2013 historical rates, and did not improve during 2015.

---

[1] All FE's are referenced herein using masculine pronouns. This is not to suggest one way or another a particular FE's gender.

FE 1 estimates that this decline contributed to a 12-15% decline in ICAMS profits during that time period. According to FE 1, the following factors negatively impacted aftermarket sales during this time period: (i) commercial airplane manufacturers, such as Boeing, Airbus, and Embraer S.A., stockpiling and selling parts directly to airlines; (ii) Boeing's PFS initiative, which reduced commercial aftermarket profit margins; (iii) airlines creating alliances or collectives to buy parts, resulting in the purchase of fewer parts, and at cheaper prices; and (iv) airlines purchasing counterfeit parts from China in greater numbers.

39. The decline in commercial aftermarket sales and profits observed by FE 1 for ICAMS had a significant impact on the financial results of both SIS and UTAS. As FE 1 explains: (i) commercial aftermarket sales were a "huge contributor" to total ICAMS profits, contributing roughly 40-45% of profits annually; (ii) ICAMS aftermarket sales represented the largest component of SIS sales and profits; and (iii) SIS comprised approximately 75% of UTAS profits annually—or at least "had to have been a major contributor" of UTAS's profits, because SIS represented 75% of legacy Goodrich's profits, legacy Goodrich was the most profitable component of UTAS post-acquisition, and SIS was its most profitable component. FE 1 was provided certain of these statistics by Keppy and Dumais.

#### i. Commercial Primes Began Stockpiling and Selling Parts Directly to Airlines

40. According to FE 1, prior to the start of the Class Period, primary commercial aircraft manufacturers ("commercial primes") entered the aftermarket by stockpiling spare parts and selling them directly to the airlines in an attempt to capitalize on high commercial aftermarket profit margins. By way of example, FE 1 recalls that ICAMS typically earned profit margins of approximately 2-7% on original equipment sales to aircraft primes such as Boeing, Airbus, Embraer, S.A. and others, compared to 20-60% profit margins on aftermarket sales. FE

1 explains that the commercial primes began locking in additional parts purchases through original equipment contracts (which typically carried narrow profit margins), and later sold these parts to the airlines in the aftermarket at a premium. This conduct resulted in lower aftermarket sales and profits for ICAMS and, consequently, UTAS. FE 1 was aware of this trend through inference and observation, and conversations with colleagues. FE 1 explains that he had access to a "Z" schedule, which is a weekly schedule published by aircraft primes to suppliers indicating what they planned to build and, thus, what they intended to buy from suppliers like UTAS at original equipment contract prices. However, FE 1 explains, purchase orders under these contracts that ICAMS received were for more parts than the Z-schedule required, and he observed a small boost in original equipment manufacturer OEM sales, offset by a decrease in commercial aftermarket sales. Because FE 1 had access to data for both ICAMS and SIS, FE 1 believes this issue affected SIS as a whole. FE 1 further recalls that while conversations regarding this issue first occurred in 2012 with ICAMS General Manager Hugh Dunkley ("Dunkley"), by 2013 its impact on commercial aftermarket sales became clearer, and he continued to have conversations about it through 2015, including with Sartain and other colleagues.

**ii. Boeing's "Partnering for Success" Program Forces UTC to Take an Average 15% Price Cut on Parts Sales**

41. FE 1 also recalls that Boeing's PFS initiative—which launched in 2012—adversely impacted commercial aftermarket sales prior to and during the Class Period.

42. According to published reports, more than two-thirds of aircraft manufacturing costs are comprised of component parts, such as those supplied by UTC. Vendors like UTC earn significantly higher operating margins—nearly 16% on average—on the manufacture and sale of component parts. Boeing launched PFS in an effort to reduce these costs by forcing massive

price cuts in the range of 15-25% on its suppliers. Indeed, Boeing CEO James McNerney conveyed the message to vendors that if they did not cooperate, they could become a part of a "no fly" list and be barred from doing future business with Boeing, while "someone else may have that opportunity."

43. Even long-time supplier UTC reportedly was not spared from Boeing's aggressive negotiating tactics. For example, in 2013, when UTC failed to accommodate Boeing's demands to cut costs for landing gear for its 777 airplane, Boeing shifted the manufacturing of these parts to Canadian rival Heroux-Devtek, which was also awarded Boeing's contract for the 777X landing gear. Thereafter, UTC acceded to Boeing's demands and signed onto its PFS program. FE 1 similarly recalled that Boeing sought larger price breaks, in the range of 18-25%, on its newer contracts, like the 787, and less of a cut, in the range of 10%, on its older contracts in connection with its 777 and 737 airplanes.

**iii. Airline Collectives Pooled Their Purchasing Power for Replacement Parts**

44. Beginning in approximately 2013, commercial airlines began forming what FE 1 describes as "alliances" or "collectives," whose purpose was to pool the commercial airlines' buying power for the purchase of spare or replacement parts, resulting in lower commercial aftermarket sales to UTAS. FE 1 explains that historically, commercial airlines like KLM (KLM Royal Dutch Airlines), Delta and Lufthansa (Deutsche Lufthansa AG) would buy full sets of replacement parts directly from suppliers like UTC. These collectives, by contrast, purchased replacement parts for several aircrafts and stored them at a central location. The members of the collective could then purchase specific parts out of the collective on an as-needed basis. According to FE 1, this led to fewer commercial aftermarket sales and lower margins for ICAMS and, therefore, UTAS. FE 1 recalls discussing this and other issues that were negatively

impacting commercial aftermarket sales with SIS and ICAMS leadership, including Sartain and Dunkley, among others.

45. This information is corroborated by FE 2, an SIS Senior Manager, Financial Planning & Analysis ("FP&A"), Business Development & Engineering ("BD&E") during the Class Period. FE 2 confirms that the pooling of spare parts purchases by the big airlines had a negative impact on UTAS's commercial aftermarket sales. Specifically, FE 2 recalls that airlines were pulling parts from older airplanes or buying parts and selling them to each other, rather than paying UTAS's higher commercial aftermarket prices, which had a significant impact on commercial aftermarket sales.

**iv. Airlines Increasingly Purchase Counterfeit Parts**

46. FE 1 also recalls that a rise in counterfeit electronic parts in the commercial aftermarket contributed to a decline in commercial aftermarket sales during his tenure. Specifically, FE 1 recalls a "staff meeting" in the spring of 2013, with the Vice President of Engineering for UTAS's SIS and Electric Systems business units, Mark Roberts, during which they discussed actions to shore up the issue of counterfeit parts in the marketplace.

47. This information is corroborated by FE 3, a Procurement Manager at a UTAS Aftermarket Maintenance Repair & Overhaul ("MRO") facility prior to and throughout the Class Period. FE 3 recalls a visit to his MRO facility in late 2014 or early 2015 by three mid-level managers from UTAS's headquarters in Charlotte to gather data on counterfeit parts. These managers met separately with FE 3, as well as the plant Engineering Manager, Quality Control Manager, Controller, and others. FE 3 recalls the managers stating that counterfeit parts presented quality issues, but also had a negative impact on commercial aftermarket sales and that during the meeting they discussed the managers' concern with protecting the Airbus A310, A319

and A320 platforms. FE 3 further recalls that during the meeting one of the managers stated that they would be issuing a report to Defendant Gitlin regarding their visit.

### C. UTC/UTAS Management Were Aware of the Matters Adversely Affecting Commercial Aftermarket Sales

48. These trends and their adverse impact on UTAS commercial aftermarket sales were well-known to UTC management prior to the start of the Class Period.

49. Specifically, FE 1 recalls a discussion in January 2014 among Sartain and leaders of SIS's other operating segments, including Mark Skarohlid from Air Data, MEMs and Flight Management Systems ("AMFMS") and Scott Burdick from De-icing Rescue and Specialty Systems ("DRSS"), which resulted in a decision to "benchmark" the problems they each were seeing in deteriorating commercial aftermarket sales, as well as their impact on UTAS's other business units. As FE 1 explains, the 2013 year had just ended and performance was down, which prompted the analysis. FE 1 believes that after this meeting, Sartain discussed these issues with Keppy, who discussed them with other UTAS business units because, at the following quarterly meeting at SIS headquarters in March or April 2014 (attended by FE 1), Keppy, Sartain, the heads of SIS's business segments, SIS Director of Operations, Todd Brindlinger, the SIS finance lead, and others), Keppy indicated that UTAS's other business units were also being negatively impacted by the issues plaguing commercial aftermarket sales at SIS. These issues included commercial primes stockpiling and selling spare parts directly to airlines, Boeing's PFS program, airlines forming collectives and the rise in counterfeit parts.

50. According to FE 1, these problems and their impact on commercial aftermarket sales were also discussed at monthly SIS Operational Reviews, which FE 1 regularly attended. FE 1 recalls that in addition to ICAMS, the MRO unit that shared space with ICAMS also participated in the monthly Operational Reviews and reported similar issues (commercial primes

stockpiling parts, Boeing's PFS initiative, airlines forming collectives, and a proliferation of counterfeit parts in the marketplace). Sartain, who lived and worked in Connecticut and, according to FE 1 had ready access to UTC leadership, also discussed the overall impact of these issues on UTAS at the SIS headquarter meetings in Burnsville, Minnesota throughout 2014 and into 2015.

51. According to FE 1, Keppy was responsible for briefing PAS President, Defendant Bellemare and other members of UTAS Senior Corporate leadership on the matters discussed at the monthly SIS Operational Reviews. FE 1 explains that during his tenure at UTC, briefings happened monthly and built upon each other. For example, during week 2 of each month, ICAMS briefed Sartain. During week 3, Sartain and the other SIS segment leaders briefed Keppy. During week 4, Keppy briefed Dumais and Defendants Gitlin and Bellemare. FE 1 believes that Keppy and the Director of SIS Operations, Todd Brindlinger, were involved in these briefings, along with Defendant Bellemare's finance lead because "the way UTC works" is that the Presidents would always have their finance leads and, typically, their operational leads, accompany them at such meetings. FE 1 recalls that a two-hour block was set aside for these briefings, at which the Presidents of UTAS's other business units would also make their respective presentations. FE 1 attended a few such briefings to Defendant Bellemare during his tenure.

### D. UTC/UTAS Management Reject Efforts to Incorporate Declining Commercial Aftermarket Sales into their Guidance and Impose Unrealistic Targets on the Business Units

52. According to these former employees, efforts were made by the UTAS business units to incorporate the deteriorating commercial aftermarket conditions into the Company's forecasts for FY2015, but management rejected their efforts and instead imposed unreasonable and unrealistic earnings targets on the business units—all-the-while representing to investors that

UTC expected to experience high single digit growth in UTAS commercial aftermarket sales in 2015. Specifically, FE 1 recalls that the adverse trends discussed in ¶¶ 35-47 were incorporated into the FY2015 plan for SIS's ICAMS segment. This plan was presented through Keppy to UTC management, including Dumais and Defendants Gitlin and Bellemare. Following Defendant Bellemare's review, Keppy received a revised plan from Defendant Bellemare's team (through Dumais) and shared them with Sartain, who passed them along to FE 1 and his team.

53. FE 1 recalls that the FY2015 plan that FE 1 helped prepare for ICAMS, which accounted for deteriorating commercial aftermarket sales, was rejected, and that the revised plan which came back to FE 1 following Bellemare's review reflected a 30-35% increase in sales targets versus the plan ICAMS submitted. According to FE 1, these revised plans included sales and profit targets that were totally unrealistic—numbers "***no human being could ever hit***," and FE 1 recalls conversations wherein these numbers were described as "***beyond the test of reasonableness***" and as having "***crossed into ridiculousness***." FE 1 explains that while an 11% increase could be considered a stretch goal, a 25-30% increase was unrealistic, and 30-35% increase presented a pipeline challenge, as there were only so many commercial airlines and UTAS already controlled approximately 92% of the market for commercial spares. As such, right before Thanksgiving 2014, at one of Sartain's quarterly offsite meetings (for his leadership team), in Cheshire, Connecticut, after they had received the revised forecasts back from UTC management, FE 1 recalls that the entire Operational Review team concluded that Defendant Bellemare and his team ignored market reality in devising these forecasts. FE 1 also recalls conversations with AMFMS Engineer Eric Hogan indicating that AMFMS was experiencing the same frustrations as ICAMS.

54. The business units, however, were stuck with these forecasts. For example, FE 1 learned from his boss, Sartain, that when UTAS PC&S Senior Vice President Tom Mepham argued with Defendant Bellemare about the unrealistic FY2015 targets imposed on them by UTC management, Bellemare told Mepham to "get on board or we will find someone who will."

55. FE 4, a former senior financial executive within SIS's Kidde Aerospace & Defense Systems ("Kidde") segment during the Class Period corroborates this information. Specifically, FE 4 recalls that the FY2015 sales goals given to Kidde were totally unrealistic and had "***zero***" chance of being met. By way of example, FE 4 recalls being told on one occasion that SIS was given a forecast of approximately $30 million for a month; however Kidde had never reached that goal in *any* month. FE 5, an Aftermarket Demand Planner within Kidde from October 2014 and throughout the Class Period, likewise recalls senior executives regularly setting goals for aftermarket sales that were above the sales projection plan formulated by aftermarket employees, and out of reach. FE 5 believes that the plan for FY2015 called for $80 million in aftermarket sales, which was significantly higher than in past years. FE 5 had access to historical sales data through an internal system called the MRP-AS400, and believes such figures were accessible to "pretty much everyone," including upper level executives. FE 5 recalls that the consensus among Aftermarket customer service reps was bewilderment over how the executives came up with these targets.

56. FE 4 similarly recalls that the business units could not challenge targets set by management. FE 4 explains that, historically, there had been more of a give-and-take with management regarding the business unit's sales forecasts, and if a segment or unit was not going to reach its goal, it would submit plans to management on a strategy aimed at trying to reach that goal. Around the start of the Class Period, however, the directive from above had become here's

your number, and do not give management any bad news. Specifically, FE 4 recalls that SIS President Keppy would bully people with comments like you will make this number and that people who could not make their numbers were moved out of SIS or lost their jobs.

57. FE 1 and FE 4's information is corroborated by FE 2, whose responsibilities included preparing forecasts for UTAS's SIS business unit which were provided to UTAS and UTC management. FE 2 recalls that the forecasting process generally began around June of each year and was supposed to be a bottom-up process, which began with each of SIS's business segments (including ICAMS, Kidde, AMFMS, and DRSS) generating their own sales forecasts. FE 2's team would then take the sales forecasts prepared by the business segments and use them to generate forecasts for SIS, which would be rolled up to SIS management and, ultimately, to UTAS leadership. FE 2 recalls that the sales forecasts provided by the businesses were reasonable and that the forecasts FE 2's team put together reflected the ***maximum*** growth that they believed was possible based on the segment forecasts. In other words, SIS's forecasts already included what FE 2 describes as "stretch" goals.

58. FE 2 recalls that there were two levels of review before the forecast was presented to UTAS leadership. First, FE 2's team would get input on their forecasts from UTAS FP&A Manager Dana Jordan. Then, FE 2's team would present their forecasts to SIS President Keppy and CFO Colleen Lott ("Lott"). Around September or October of each year, SIS President Keppy and SIS CFO Lott, presented their forecasts to UTAS management, including PC&S President Dumais and his leadership team. This meeting was also attended by the SIS Vice President of Business Development, SIS Vice President of Engineering and the General Managers from each of the business segments within SIS. A UTAS management team would then present UTAS's plan for the year to UTC management.

59. According to FE 2, following UTAS leadership's presentation to UTC management, actual targets would be set. FE 2 recalls that these targets included "stretch" goals that came in the form of differing dollar amounts across all UTAS business units, and that UTAS management pushed these goals to the business units through their respective Presidents and CFOs. FE 2 recalls that the targets set for SIS for FY2015, which were communicated from UTAS FP&A Director Chris Peat to SIS CFO Lott, to FE 2, included an additional $20 million of EBIT beyond the "stretch" goals SIS initially budgeted. This additional $20 million EBIT requirement, FE 2 explains, was very high given the "stretch" already included in the initial plans. FE 2 states that there was no explanation provided for the additional requirement. It was up to SIS leadership, including the CFO and VP of Business Development, to determine how to allocate the targets among the segments, to best meet these goals. FE 2 also recalls that SIS tried to find ways to meet UTC's SIS targets and improve profits by reducing costs, including trimming selling, general and administrative expenses and travel expenses, as well as plant operations, but explained that such efforts typically took years to see results.

60. To FE 1's knowledge, UTAS's other business units also had unrealistic targets imposed upon them by UTAS management.

61. These allegations are also corroborated by FE 6, a former Manager, Business Development and Strategy ("BD&S") at UTAS prior to and throughout the Class Period. FE 6 explained that the BD&S group was a "corporate team" within UTAS, led by the President of Aftermarket Services, which was responsible for, among other things, developing the UTAS Aftermarket Services sales growth outlook for FY2015 and planning the strategies for how to achieve it.

62. FE 6 recalls that his BD&S group developed the FY2015 Aftermarket Services sales growth outlook in the second half of FY2014, by conducting a complete "bottom-up" analysis, which studied, among other things, UTAS's current and historical performance, market indicators, the market's current impact on UTAS, new sales opportunities for FY2015, the loss of revenue streams from expiring opportunities, and any pricing impacts. Aftermarket employees within UTAS's business units were also consulted.

63. This bottom-up analysis resulted in a low to mid-single digit growth forecast for commercial aftermarket services which was first presented to Paul Snyder ("Snyder"), Vice President of Aftermarket Services, and members of his staff, including Brian Costa, Vice President and General Manager of Customer Service, and FE 6, as well as Jim Patrick ("Patrick"), Vice President of Customer Service, members of his staff, and Director of Commercial Sales, Dave McDonough, shortly before Labor Day weekend. FE 6 recalls that, for purposes of this forecasting process, UTAS's Aircraft Systems and PC&S business segments met jointly at that time.

64. The analysis then went through a process of refinement and pressure testing, during which back-and-forth discussions took place between FE 6's BD&S staff and Aftermarket Services management, and Snyder, through Rich Feely, Director of BD&S, would ask FE 6 and his group to change certain assumptions, pressure test the results, and refine the forecast accordingly. As the forecast was refined, individuals involved in further presentations to Snyder included those at the Director and Vice President level.

65. Next, Snyder and his staff would present the forecast to the President of Aftermarket services, Raffaele Virgili ("Virgili"), in late September, early October. FE 6 believes that the commercial aftermarket sales growth forecast that was presented to Virgili was

closer to mid-single digit growth. FE 6 recalls that the slide deck used when presenting the forecast to Virgili contained numerous slides and back-up slides of information supporting the forecast presented.

66. Following the presentation to Virgili, Virgili and his staff, including Snyder and Patrick, presented the commercial aftermarket sales growth forecast to Defendant Gitlin and his staff, the CFO of UTAS and his staff, as well as the Presidents of UTAS's business units. FE 6 recalls that the initial presentation to Defendant Gitlin occurred in late October/early November 2014, and forecast, at best, mid-single digit sales growth.

67. Discussions with Defendant Gitlin and his staff regarding the forecasts continued from mid-November until sometime in December 2014, according to FE 6.

68. FE 6 recalls that a major point of discussion during these various meetings was how to treat initial provisioning for spare parts, specifically with respect to Boeing's 787 aircraft, requiring Aftermarket Services perform a deep dive into the issue. FE 6 explained that when a plane is brand new, spare parts are not just hanging around and airlines and aircraft manufacturers cannot wait to have parts built when the need arises. Accordingly, customers initially order spare parts provisioning to meet their needs.

69. FE 6 recalls that in 2012, Boeing launched its 787 aircraft to twelve customers in six continents. The customers were so dispersed, however, that it created the need for a substantial amount of initial provisioning, to ensure that replacement parts were readily available. Specifically, FE 6 recalls that the initial provisioning for the Boeing 787 platform was over $100 million per year, and was a key driver of their sales and EBIT numbers. According to FE 6, Aftermarket Services projected a lower amount of 787 provisioning in FY2015 compared to FY2014, and Aftermarket Services put forward a plan demonstrating as much. FE 6 further

recalls that presentation slides projecting a reduction in 787 provisioning for FY2015 were presented to Defendant Gitlin.

70. UTAS and/or UTC management rejected the well-reasoned, refined, and pressure-tested commercial aftermarket sales growth forecast developed by UTAS Aftermarket Services (which incorporated the negative 787 provisioning trends and resulted in the mid-single digit growth forecast, at best, presented to UTAS management). According to FE 6, a topline forecast of double digit growth ultimately came back to FE 6's group following management's review (communicated by Defendant Gitlin to Virgili). However, FE 6 recalls that the topline forecast was not based on an analysis and did not include where the growth would come from. Indeed, FE 6 recalls that the data submitted to UTAS management did not show "anything close to double digit sales growth," but rather showed that double digit growth was far from achievable, including on account of the decline in Boeing 787 provisioning. FE 6 noted that the high single digit forecast provided to the market was likewise a stretch over what FE 6's team devised and thought achievable based on their bottom-up analysis.

71. Because senior management increased the projected commercial aftermarket sales growth number, FE 6 explains, Aftermarket Services' EBIT target would also be higher than originally projected by their bottom-up analysis. As FE 6 explains, after receiving the top-down number from management, the question of whether or not it was actually achievable was no longer relevant and FE 6 and his staff began devising strategies to attempt to meet the management-imposed projected growth rate.

### E. UTAS Historically Relied Upon the Undisclosed Practice of Pulling-in Sales to Meet Earnings Targets

72. One of the strategies through which Aftermarket Services sought to meet UTC management's EBIT target was by "pulling in" future sales into the current period. This

practice, which involved inducing customers to purchase products earlier than they otherwise would have, allowed the Company to report higher sales in the current quarter, thereby creating the illusion of growth. However, this practice created numerous risks to the Company's future profitability that were not disclosed to investors. For example, it put proportionately more pressure on subsequent quarters, because future sales had already been "pulled in," and so the Company had to keep generating progressively higher numbers to make up for it. Given the trends adversely impacting commercial aftermarket sales prior to and during the Class Period, this practice was unsustainable. Without an ever-expanding future pool of sales to draw from, as FE 4 explained, at some point, there is nothing left to pull from.

73. FE 6 recalls that some "pulling in" of sales occurred each year, but that there was an above-normal amount of "pulling in" contemplated as a means to reach management's growth number for FY2015. Indeed, FE 6 recalls that UTAS business units looked to pull in revenue for FY2015, and there was some level of business unit involvement with the corporate team to determine if pull-in sales were viable from month to month.

74. These allegations are corroborated by FE 4 and FE 5, who each recall the use of this practice within SIS's Kidde segment. FE 5 recalls conversations with other SIS Aftermarket Demand Planners, including those based at SIS headquarters in Minnesota, as well as other more senior SIS employees, which confirmed that pulling in sales was a common practice within SIS. FE 5 further recalls that "from the get go" when FE 5 began working for the company in October 2014, aftermarket sales did not materialize and the company missed sales goals.

75. These shortfalls were communicated to the Director of Aftermarket for Kidde, and rolled up to senior leadership through the "business-in-hand" report, FE 5 recalls. The "business-in-hand" report was generated weekly and reported on Aftermarket sales, reflected

shortcomings for the quarter and compared current period results to prior year sales. FE 5 recalls that the "business-in-hand" reports were circulated to executives at SIS headquarters, FE 5 believes through the Kidde General Manager. FE 5 also states that "business-in-hand" reports were produced by SIS's other business segments.

76. FE 5's team also presented its results (including sales misses) to the SIS aftermarket demand team monthly during a "demand review," which occurred during week two of a given month. FE 5 recalls that the other departments likewise presented their results (including sales misses) during the monthly demand review meetings. FE 5 explains that the sales results from FE 5's team and the other SIS segments were gathered at the beginning of week two each month, and were presented to SIS President Keppy at the end of that week.

77. FE 5 recalled that management was unhappy that the sales numbers were not in line with projections, and recalled receiving communications from the Kidde General Manager and the Director of Aftermarket that the sales numbers were unacceptable. As a result, Kidde's Director of Aftermarket and his team would pull sales into the current month from future months. For a period of time, FE 5 recalls, they were able to pull in approximately $2 million in sales from forward months into months they were short. However, during the first or second quarter of 2015, the ability to pull in sales stopped and they failed to meet their sales goals. FE 5 explains that the sales misses would have been even larger if Aftermarket had not pulled in sales from future periods.

### F. A Slowing Chinese Construction Market Impedes Otis China's Ability to Compete for New Orders and Convert Existing Backlog

78. By the start of the Class Period, UTC/Otis also faced steep competition and pricing pressure amid struggling commercial real estate and construction markets in China that hampered the Company's ability to secure new orders. Because of these pressures, the amount

of Otis' reported backlog (which consisted of orders that had been placed, but full payment not made) was viewed as an important indicator of its expected future earnings. This was particularly so given the nature of the elevator and escalator business, in which contracted projects often took years to complete, and revenues were booked not at the time an order was placed, but rather at the time of production. To this end, analysts observed during the Class Period that "Otis top-line performance should be driven by . . . backlog conversion in China."

79. Despite this slowing property market in China, Defendants' FY2015 guidance assumed a 10% growth rate for Asia. Defendants represented that UTC would enjoy 6-7% growth based solely on the conversion of existing backlog into sales. Specifically, Defendants told the market that "most" of the existing backlog in China "will convert" into realized sales in 2015, "which in [and] of itself ought to give you high single digit kind of growth in China." These statements were false, lacked a reasonable basis given the existing market conditions prior to and at the start of the Class Period, and were premised solely upon the mere "hop[e]" of a market recovery in China.

80. Contrary to Defendants' representations, former employees recall that Otis sales began to slow following two big elevator accidents involving Otis elevators, and continued to slide through 2014 as a result of deteriorating construction markets in China impacting new sales orders. Specifically, FE 7, who worked as a sales contract reviewer at Shanghai Otis Elevator Co., Ltd. from July 2011 to July/August 2015, recalls elevator accidents in Beijing and Shanghai prior to the start of the Class Period adversely impacting sales. FE 8, a senior manager at two Otis subsidiaries between March 2006 and March 2015, similarly recalls a loss of market share to competitors following these elevator accidents, and that this market share loss was reported to Otis management through situation reports.

81. This information is corroborated by FE 9, the former Head of Sales at Otis in Shanghai, China from July 2007 until February 2016, who similarly recalls a fatal accident involving an Otis product in Beijing that was broadcasted nationally and caused a "very big shake" in the Otis brand and had a big impact within the industry. According to FE 9, sales for Otis in China "climaxed" in 2012, and experienced a slow, but steady, decline beginning in 2013 and continuing into 2014, when the decline became "more obvious." FE 7 similarly recalls sales continuing to slide in 2014 as a result of the deteriorating construction markets in China impacting the Company's new sales orders, having fewer contracts to review in 2014 compared to prior years, and that the order amount for the contracts was smaller as well. FE 10, a sales manager at Otis Elevator (China) Co. Ltd. for the Tianjin area until March 2015, similarly recalls a slowdown in new elevator sales in July/August 2014, which he learned about through sales team meetings at the end of 2014, but stated that senior management must know the sales trends better, as they could access sales data for any region during any period. FE 10 also recalls that senior management were updated by the sales team regularly after their meetings, during which the sales team would go through sales figures for the past few months and come up with other forecasts for the upcoming months.

82. FE 9 further recalls that this downward trend was apparent by mid-2014. In particular, FE 9 describes a meeting at that time with his boss, John Xiao, the VP of Marketing and Regional General Manager at Otis Shanghai, during which they discussed how the market was going to continue to get "worse and worse."

83. However, attracting new business was difficult in light of significant pricing pressures Otis China faced from competitors. For example. FE 9 recalls that Otis' products were very expensive relative to the Company's primary competitors in the Chinese market, including

Schindler, Kone and Mitsubishi, and inferior in terms of quality and specifications. FE 7 recalls steep discounts of up to 40% on contracts signed in 2014 (compared to the normal discount rate of 20%), which FE 7's sales colleagues explained were given to customers to allow Otis to compete in an environment where competitors were lowering their prices to attract business from Otis.

84. Nevertheless FE 7 recalls that every year Otis lost market share to competitors. Defendants themselves also belatedly admitted that Otis often lost new business in China to competitors whose products were superior and whose bids, Defendants' admitted, were "more aggressive," and that, by the start of the Class Period, Otis had been losing market share in China (one of its largest markets) for years—going from roughly 25% market share in 2007-2008 to less than 15% market share by the end of the Class Period.

85. In light of the foregoing issues adversely impacting Otis China's business, FE 10 recalls that the possibility of meeting new order sales targets set for Otis China for FY2015 was very low, and unlikely to be met. FE 10 further recalls that when notified of the sales targets for FY2015, the sales people immediately complained to the general manager in Tianjin that the sales targets were not attainable. FE 8 explains that Otis management always set revenue targets that were too high, and that the assumptions were not comprehensive enough, as they were simply based on the market size and orders from the previous year. Indeed, contrary to Defendants' assumption at the start of the Class Period of a "return to normal growth in China" (which baked in 5% order growth rate for the year), Defendants ultimately admitted that new orders had declined 10% year-over-year by July 2015.

86. The deteriorating market conditions also impacted Otis's ability to convert backlog into sales. According to Defendants, UTC historically enjoyed a 60% conversion rate in

its opening backlog at Otis. A 60% conversion rate means that it will convert roughly 60% of its backlog into sales during the year. However, as Defendants belatedly admitted, "largely" due to credit availability issues in China relating to the economic slowdown, Otis's conversion rate had been trending down by the start of the Class Period and was down 2 to 3 points by July 2015.

### G. Otis' Backlog Was Comprised of False or Fake and Specially Approved Orders

87. Former employees also recall that prior to and during the Class Period, Otis China engaged in what they independently described as a common practice of recording orders that would never be fulfilled or realized and described these orders as "虚假订单," which translates as "false orders" or "fake orders." These orders would be recorded in the current period to boost sales figures and included in Otis China's backlog. FE 10 and FE 8 specifically recall that backlog at Otis China in FY2014 included these false or fake orders that would never be converted into realized sales. FE 8 estimates that 15-20% of the backlog could be comprised of false or fake orders.

88. In addition, FE 7 recalls that when sales people were trying to meet their sales targets, their company's leader would apply to Otis China for "特批订单," which translates as "specially approved orders"—i.e., orders for which the sales people closed the deal and possibly signed a contract, but for which the company would not receive a deposit—to be counted towards their sales performance. FE 7 believes that the request for specially approved orders happened a lot at the end of the year and at the end of quarters, and that there were "很多" (which translates to "a lot") of specially approved orders at the end of 2014.

89. As a result of these practices and the deteriorating market conditions, contrary to Defendants' representations, Otis' reported backlog was not a reliable indicator of expected

future earnings. As such, Defendants' assurances that UTC would be able to meet its guidance, in part, through backlog conversion in China, were materially false and misleading.

### H. Defendant Hayes Becomes CEO and Market Participants Expect Conservative Guidance

90. On November 24, 2014, the Company announced the abrupt departure of former CEO Chenevert, and the promotion of Defendant Hayes to CEO. Market participants reacted positively to Hayes' promotion, commenting on his purported conservative nature and open style of identifying "known negatives" that had the potential to impact UTC's results. For example, an RBC Capital Markets ("RBC") analyst stated that Defendant Hayes "is well regarded by investors [and] has recently done a good job in our view rebasing expectations for next year's earnings, flagging what could be regarded as 'known negatives.'" Similarly, a Deutsche Bank Markets Research ("Deutsche Bank") analyst commented that "Hayes has earned more Street credibility than most for his straight-shooter approach and frequent access to investors."

91. Given Hayes' reputation, analysts expected that UTC's FY2015 guidance—which the Company was scheduled to deliver on December 11, 2014—would be on the conservative side. For example, analysts from RBC noted that "Chenevert had traditionally projected a more optimistic outlook than Hayes" and that "a more restrained view on the outlook could be an immediate impact of th[e] CEO change as the UTX 2015 outlook meeting looms on December 11th." As a result, they "expect[ed] . . . Hayes to lead the show, and to probably give a more conservative outlook than his predecessor." Deutsche Bank analysts agreed, commenting that "Hayes is a realist who borders on the pessimistic while Chenevert was an optimistic who flirted with realism."

### I. UTC Issues Unrealistic Guidance That Defendants Failed to Validate

92. Contrary to analysts' beliefs, and despite management's knowledge of the above ongoing trends adversely affecting UTAS's commercial aftermarket sales, on December 11, 2014, in one of Defendant Hayes' first major public announcements after being named CEO, UTC issued FY2015 earnings guidance that, unbeknownst to investors, was: (i) "overly optimistic"; (ii) "way too aggressive"; (iii) based on assumptions that lacked a "strong basis" in fact; and (iv) not sufficiently validated by UTC senior management prior to its issuance. Specifically, Defendants assumed high single digit growth for UTAS's commercial aftermarket business, and 10% growth in China, despite significant slowdowns in both of those markets in the periods leading up to the start of the Class Period. As admitted after the end of the Class Period, however, among other things, UTC's FY2015 earnings guidance was fraudulently overstated because, at the time UTC issued its guidance to investors, management knew that they had "push[ed] the [UTAS commercial] aftermarket guys to deliver a much bigger number" than they could realistically attain, and at the same time did not "delve[] deep enough into" or "question enough the assumptions underlying how they were going to get there."

93. In addition, Defendants fraudulently reaffirmed UTC's core operational guidance (after making adjustments for other, unrelated factors) on multiple occasions throughout the Class Period—including after receiving monthly reports showing that business units had negative variances in their performance against management's plan. In fact, Defendants reaffirmed the core FY2015 operational guidance as late as June 15, 2015, despite later acknowledging that they knew at that time that it would need to be taken down, but did not do so because they were "hoping" for a turnaround.

### J. Management Knew or Recklessly Disregarded That UTAS Commercial Aftermarket Sales Failed to Meet Forecasts

94. Throughout the Class Period, UTC management had access to information indicating that the Company's business units were not performing in line with expectations. According to FE 4, all C-suite executives had visibility into the Hyperion Financial Management System ("HFMS"), which was the consolidator of all of UTC's financial data from around the world. FE 4 further explains that all Kidde forecast information was put into HFMS and that forecast information for all SIS segments was rolled up into HFMS for UTAS.

95. In addition, UTC management was apprised at least monthly of negative variances in UTAS's performance against the unreasonable and unrealistic assumptions they imposed on the business units and baselessly touted and reinforced to the market. Former employees described processes by which information concerning UTAS's commercial aftermarket sales were regularly tracked and communicated among all levels of UTAS staff and management. For example, FE 3 recalls that his MRO General Manager conducted monthly "all hands" meetings at which he would give a power point slide presentation showing the MRO's commercial aftermarket performance in relation to that of other MROs, which reflected an overall decline in UTAS commercial aftermarket performance. Moreover, FE 3 recalls that UTC Director of Aftermarket Bob Butz ("Butz") attended these monthly meetings either in person or by phone, and that if he was in person, he would have slides built into the General Manager's deck for presentation. FE 3 recalled that Butz indicated that UTAS commercial aftermarket sales were down in late 2014 and early 2015.

96. FE 1 describes a cyclical weekly reporting processes by which management was apprised of declining commercial aftermarket sales and the impact of such on his segment's ability to meet guidance. Further, FE 1 recalls that ICAMS's numbers were down during his

tenure because it did not have a solid commercial aftermarket business and that SIS President Keppy expressed concern over this during one of their meetings at SIS headquarters.

97. FE 1 further explains that for each month in which forecasted sales and profits were not met, Keppy required FE 1 and fellow SIS department leads to provide Keppy with a "briefing deck" explaining the cause of the negative variances. Keppy was then responsible for distilling the briefing decks from the department leads and submitting a single SIS deck to Defendant Bellemare. According to FE 1, Keppy, accompanied by his Finance and Operations team, briefed Bellemare every month on SIS metrics, such as sales, deliveries, profits, variances to plan, and many other areas discussed at the Operational Reviews, as part of the week four cycle of briefings discussed above at ¶ 51. FE 1 states that similar briefing procedures described in ¶ 51 were followed at UTAS's other business units.

98. FE 4 recalls constant calls between Kidde leadership, SIS President Keppy, and Keppy's team, including representatives in Finance, Sales, and the General Managers regarding sales and forecasts, as well as monthly meetings at the beginning of the quarter, which became weekly or more frequently towards the end of the quarter, to review Kidde's progress against its targets. FE 4 participated in calls with senior financial executives of the other three SIS segments who all shared similar concerns about not being able to meet their targets.

99. FE 2 participated in monthly meetings with both SIS CFO Lott and the Vice President of Business Development, to review the forecasts and efforts to achieve these goals. FE 2 also had monthly meetings with SIS President Keppy, CFO Lott and the General Managers of SIS's business segments to discuss performance and variances against the plan. Around February 2015, these meetings were monthly, and increased in frequency as management began to realize that SIS would not hit their numbers. FE 2 states that declining commercial

aftermarket sales and their impact on SIS's ability to meet guidance were discussed at these meetings, and that Action Plans to address these issues were put together. FE 2 further explains that the General Managers of the business units were responsible for preparing the Action Plans, and that they would present their Action Plans to SIS President Keppy, CFO Lott and the Vice President of Business Development. Keppy would then take these Action Plans to the Presidents Council Meeting, a monthly meeting of the President of UTAS and all the Presidents of UTAS's business units. FE 2 also recalls that there were: (i) monthly meetings with the UTAS Director of FP&A Chris Peat and/or his Manager of FP&A Dana Jordan to discuss variances in SIS's performance against its plan; and (ii) monthly calls with UTAS management where they talked through the numbers and performance against guidance, and stated that SIS CFO Lott was constantly having calls with the UTAS CFO regarding these issues.

100. Despite these regular meetings and presentations demonstrating to UTC management that performance in UTAS's business units was not in line with its expectations, Defendants repeatedly reaffirmed the Company's core operational EPS guidance issued on December 11, 2014, signaling to the market that the Company was performing in line with expectations and that it was "on track" to meet these financial goals.

**K. The Truth Begins to Be Revealed**

101. On June 15, 2015, at the Paris Air Show, Defendant Gitlin hinted that there was "a little bit of pressure on the low-end of [the] EBIT guidance" for UTAS (of $225 to $275 million EBIT up over 2014). Specifically, Defendant Gitlin stated that UTAS's guidance "was premised on commercial aftermarket [sales] being up in the high single digits, but [that they] will not be up in the high single digits" because the first half of the year had seen "weaker than expected" commercial aftermarket sales.

102. However, Defendant Gitlin noted that Defendants had expected commercial aftermarket sales to be back-end loaded in the year, and that the Company "still expect that to be the case." Moreover, Defendant Gitlin assured investors that UTAS was "being tenacious on cost reduction to help offset that headwind as much as possible," and Defendant Johri reaffirmed UTC's guidance (excluding Sikorsky). Defendants' statements continued to misrepresent and conceal that, in fact, the Company's guidance, particularly for UTAS, was "overly optimistic" and "way too aggressive," to the point that it lacked a "strong basis," and that management did not sufficiently vet the guidance before it was issued. Moreover, Defendants' statements that commercial aftermarket sales would be "back end loaded" were materially false and misleading, as Defendants concealed that UTC's practice of pulling in sales from future periods meant that it was pulling in sales from the very periods that Defendants claimed would offset the slower first half.

103. Following Defendants' disclosures at the Paris Air Show, UTC's common stock price declined by a total of 2.5%, falling from its closing price of $117.60 on Friday, June 12, 2015, to close at $114.61 per share on Monday, July 15, 2015.

104. On July 21, 2015, Defendants finally revised downward UTC's guidance for FY2015, from $6.85 to $7.05 per share to $6.15 to $6.30 per share, admitting that the guidance lacked a "strong basis" when it was issued, as certain assumptions were not adequately vetted, and that weak commercial aftermarket sales at UTAS and an inability to convert backlog, which included false or fake and specially approved orders, at Otis China, in part, were to blame for the revision. Defendants also belatedly admitted that they "could have" taken the guidance down for the underlying businesses prior to the end of the Class Period, but apparently chose not do so.

105. In response to this news, UTC's stock price dropped $7.77 per share, or 7.03%, to close at $102.71 on July 21, 2015, on heavy trading volume of 19,540,100 shares.

106. Analysts uniformly attributed the stock price decline on this date to the Company's surprise disclosure that, contrary to Defendants' repeated affirmations, UTC's guidance was unattainable and, in fact, was based on unreasonable an untested assumptions that lacked a "strong basis." For example, one analyst noted that the "***Guidance was the big negative from the report***," while another reported that the downward revision was "***more than a major surprise***." Analysts also commented that investors would likely "***question the ability of UTX to accurately forecast results***" and that "***it will likely take some time to rebuild the credibility lost with this latest cut***." Summing up the market's reaction to the Company's shocking disclosure, one analyst bluntly stated that "hope is not a strategy."

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. 2014 Annual Investor and Analyst Meeting

107. On December 11, 2014, UTC held its annual investor and analyst meeting. As part of his opening remarks, Defendant Hayes provided an overview of the Company's 2014 financial performance, stating that the Company would "exit the year with a good organic growth trajectory that will improve as we go into next year."

108. After reviewing the Company's 2014 performance, Defendant Hayes provided investors earnings guidance for the coming year. Specifically, Defendant Hayes stated that "overall, ***we see sales up organically about $3 billion, 3% to 5%***" and that "when all is said and done, ***we'll do $66 billion to $67 billion [in annual sales], pretty solid***." With respect to EPS, "***we expect to do earnings per share of somewhere between $7 and $7.20, that's 3% to 6% growth***." Further, while noting that "the business unit plans . . . are challenging," Defendant

Hayes emphasized that "***they are achievable. And that is the key here, challenging but achievable***."

109. During the meeting, Defendants also provided investors with a breakdown of the Company's FY2015 guidance by business segment. Speaking on behalf of UTAS, Defendant Bellemare stated:

> For Aerospace System, it's going to be a strong year again next year as we continue to benefit from the successful integration of Goodrich. ***We expect very solid conversion on strong commercial OE and aftermarket volume***. . . . ***So for UTAS, we see sales up mid-single digit and earnings up $225 million to $275 million.***

110. The slide presentation accompanying Bellemare's remarks further indicated that the Company projected "***high single digit***" growth in commercial aftermarket sales for UTAS:



111. Speaking on behalf of Otis, Defendant Darnis stated that "***[w]e expect revenue to grow in all segments and geographies, and I'd say, upper end of the mid-single digit, call it 5% to 6% organic***" for FY2015.

112. As the basis for this guidance, Defendant Darnis elaborated on the purported market conditions and performance trends that UTC was experiencing, stating that "[o]n the Otis side, after several years of flat performance and declining share, ***Otis trajectory is trending positive***."

113. Defendant Darnis also touted Otis' backlog going into FY2015 as indicative of its expected sales that year, stating that "[b]oth in Asia and North America, our backlog in new equipment order[s] is up 14% . . . versus a year ago and the balance of the product line [was] growing at the mid-single digit point."

114. During the question and answer session, analysts prodded Defendants about the assumptions baked into these forecasts. For example, one analyst asked:

> **Unknown Analyst:** Greg, your estimate for 2015 for elevator OE growth in Asia is 10%, and yet China basically had no growth the last 2 quarters. I guess your backlog was up, what, 13%, 14% year-over-year? **. . .** So what's assumed in that 10% OE growth in Asia?

Defendants Hayes and Darnis responded to analysts' questions about the assumptions that were baked into UTC's forecasts, stating as follows:

> **Defendant Hayes:** Well, it assumes a return to normal growth in China, first and foremost. ***But I think, again, the key to next year in Asia for Geraud, and I'll ask him to comment in a second, is really backlog conversion. And backlog through the end of the third quarter was up about 14% year-over-year. Most of that will convert next year, which, in of itself, ought to give you high single-digit kind of growth in China even with a slowing property market.*** Now what happens in China in terms of overall growth, we believe, again, you'll see a stimulus at some point if the economy continues to slow. China needs growth,

and I think the Chinese government will do what's necessary to support that growth. Geraud, anything to add on that?

**Defendant Darnis:** ***Yes. You got it. In fact, we have 10% revenue growth in China in our numbers. The conversion of the backlog should provide 6% to 7% alone. So then even if we have -- I think we've assumed about 5% order growth rate that we then translate into some revenue next year. You get to the 10%. So if you have flat order next year in China for new equipment, just with the backlog, you still get 7%, maybe 3 points of risk there.*** And we'll see. China has been slowing. The elevator market has been growing for 20% per year for a long time. We grew like 20% Q1. We've been flat Q2, Q3. In Q4, we look pretty much the same. ***But again, you should get 7% in China just from backlog conversion***.

115. Analysts seized upon these statements. For example, Sterne Agee analysts noted in a December 12, 2014 report that "Commercial aerospace growth will be led by high single digit growth from strong aftermarket demand, which could see upside if oil prices stay at $60 a barrel or below." Similarly, in a report issued on December 12, 2014, Oppenheimer analyst William Lee noted that "Otis top-line performance should be driven by continued new equipment sales in North America and ***backlog conversion in China***."

116. The statements identified above in ¶¶ 107-110 setting forth the Company's FY2015 earnings guidance were materially false or misleading when made because the Company's FY2015 earnings guidance was based on unrealistic and untested assumptions about the Company's projected growth that were not based on market realities, material facts which the Company failed to disclose to investors. Specifically:

a. Defendants knew at the time they issued the foregoing misstatements that, in developing the FY2015 guidance, they:

i. "just assume[d] that we were going to continue to see th[e] kind of growth" in UTAS commercial aftermarket sales that the Company had seen in prior years;

ii. Did not "think deep enough," "delve[] deep enough into" or "question enough the assumptions underlying how they were going to get there";

b. Defendants' assumptions regarding the Company's projected commercial aftermarket sales growth at UTAS were not questioned and did not have a "strong basis" in fact;

c. Defendants knew that they had "pushed the [UTAS] guys to have a plan that was going to be up roughly $300 million for the year, [a]nd in order to do that, they had to push the aftermarket guys to deliver a much bigger number," but there was not "***a strong basis in that aftermarket assumption around how we were going to get there***";

d. Defendants were "too aggressive" with respect to the assumptions for Otis in China that were used in formulating UTC's FY2015 earnings guidance, including that Defendants knew or recklessly disregarded the impact of the "significant slowdown of construction markets in China" (with real estate investment, new construction starts and floor space sold all under pressure) on UTC's FY2015 guidance, which manifested in a decline in new equipment orders in China and a slowdown in the rate of backlog conversion which, as Defendants ultimately conceded, would not go away even in 2016.

117. Former employees also confirmed that, contrary to Defendants' public statements touting the Company's FY2015 earnings guidance and specific sales and revenue forecasts at UTAS and Otis, UTC's FY2015 guidance omitted material information concerning the attainable level of growth in these divisions, and therefore Defendants' untested assumptions did not have a reasonable basis because, *inter alia*:

a. Prior to the start of and during the Class Period, UTAS commercial aftermarket sales were adversely affected by commercial primes selling directly to airlines, Boeing's PFS initiative, airline collectives pooling parts and surplus parts for purchase out of their collectives, and the proliferation of counterfeit parts in the marketplace, which issues, were discussed both at quarterly meetings at SIS headquarters and at monthly Operational Reviews, and thereafter were reported to UTC/UTAS management, including Dumais and Defendants Gitlin and Bellemare, on a monthly basis as part of UTC's cyclical briefing process (*see* ¶ 51).

b. FY2015 plans for low to mid-single digit growth for UTAS commercial Aftermarket Services, which accounted for a decline in Boeing 787 provisioning and were presented to UTAS management, and mid-single digit growth, at best, which was presented to Defendant Gitlin and other members of UTAS management and had been pressure-tested and supported by slides of back-up data, were rejected by UTAS and/or UTC executives and revised upward to a high single digit sales growth target for UTAS commercial aftermarket services (*see* ¶¶ 68-70).

c. The FY2015 plans formulated by UTAS's business units, which accounted for deteriorating commercial aftermarket conditions, and included "stretch" goals, were rejected by UTC/UTAS management and revised upward to the point of being "totally unrealistic" and "beyond the test of reasonableness," such that the plans "crossed into ridiculousness," and had "zero" chance of success (*see* ¶¶ 53, 55, 57, 59).

d. According to FE 2: (i) there was a meeting in September or October 2014 where FE 2's FY2015 forecasts for SIS (which "rolled-up" forecasts from SIS's business segments, including ICAMS and Kidde) were presented to UTAS management; (ii)

thereafter, UTAS management presented these forecasts to UTC management; and (iii) UTC management rejected the forecasts and "challenged" FE 2's team with an additional $20 million EBIT requirement for FY2015—which directive FE 2 explains was very high considering that the forecasts FE 2's team submitted already included what FE 2 describes as "stretch" goals (*see* ¶¶ 57-59).

e. According to FE 1, plans submitted for FE 1's segment, which accounted for commercial aftermarket sales that were off pace by 40-50% in 2013 and 2014 compared to prior years, and showed no improvement in 2015, were rejected by UTC/UTAS management, as the plans that came to FE 1's business following senior management's review reflected a 30-35% increase in their FY2015 goals (*see* ¶¶ 38, 52-53).

f. Former employees confirmed that: (i) by mid-2014 that there was a downward trend in the Chinese elevator market resulting from the slowing Chinese economy and construction markets; (ii) Otis was unable to effectively compete for new business due to its prior accidents and costly products; and (iii) Otis sales personnel regularly booked false or fake orders as sales in Otis' backlog, and submitted requests for specially approved orders to Otis management at quarter- and year-end, even though no deposit was received for such orders in order to meet sales goals, which factors rendered Otis' reported growth targets implausible (*see* ¶¶ 80-89).

118. The statements identified above in ¶¶ 107-114 concerning the Company's FY2015 earnings guidance were also materially false or misleading when made because, as set forth above in ¶¶ 72-77, 87-89, Defendants failed to disclose UTAS's reliance on the

unsustainable practice of pulling in sales from future periods, and the recording of false or fake orders and specially approved orders at Otis, to meet earnings targets.

119. In addition, Defendants' statement identified in ¶ 112, that Otis' trajectory was "***trending positive***" was materially false and misleading because, as Defendant Hayes admitted, "over the last 10 or 15 years" Defendants had "seen a continued erosion of Otis market share as we have pursued margin expansion," and Otis had "taken margin expansion to the point now where we're not terribly competitive based on new equipment pricing." As Defendant Hayes further admitted, for Otis, Defendants had "seen a big slowdown in China." (*See* ¶¶ 78-86.)

120. Defendants' statements identified in ¶¶ 113-114, concerning backlog at Otis China, including that such backlog would contribute a minimum of 6-7% growth in Asia, were also materially false and misleading because, *inter alia*, Otis' backlog included false or fake orders and specially approved orders that would not convert to realized sales in FY2015 (or ever), and conversion rates were slower than expected on account of credit availability issues in the Chinese market. (*See* ¶¶ 87-89.)

**B. Fourth Quarter 2014 Earnings Call**

121. On January 26, 2015, UTC announced its fourth-quarter 2014 and full year 2014 financial results and revised its FY2015 EPS forecasts downward to $6.55 to $7.05 per share. In the press release accompanying the announcement, Defendant Hayes explained that the EPS revision was due solely to "the continuing strengthening of the US dollar, as well as additional pension discount rate headwind."

122. Defendant Hayes also touted the Company's current financial and operating condition, stating that "***[b]ased on solid backlog and continued orders strength, we see topline momentum as we enter 2015***" and that "***our business fundamentals and operational expectations have not changed***."

123. Defendant Johri repeated these representations during a conference call with analysts and investors held on this date, stating:

> ***We now expect EPS of $6.85 to $7.05 on sales of about $65 billion to $66 billion***, down from our previous expectation of $7.00 to $7.20 EPS on sales of $66 billion to $67 billion. ***However, to make it clear, nothing has fundamentally changed in the health of the underlying businesses.***

124. Analysts questioned whether the Company's segment-level guidance remained intact despite the lowering of its annual EPS expectations. For example, Defendant Johri had the following exchange with Julian C.H. Mitchell, an analyst with Credit Suisse AG:

> **Mitchell**: And then just on commercial Aero aftermarket, as you said, the trends in Pratt and UTAS on sales were both sort of lower than the high single-digit growth guidance for 2015. So how quickly do you think you'll snap back to that high single-digit trend? Is it something you can see at the beginning of the year?
>
> **Defendant Johri**: ***Yes. At this point, I don't think the trends were any different than what we expected. . . . We still expect . . . high single-digit growth in the aftermarket at UTAS. So I wouldn't call it a change in trend.***

125. When asked by Cowen & Company analyst Cai von Rumohr whether UTC's previously projected "10% growth in constant currency in new elevator sales at Otis in China" was "still realistic," Defendant Hayes conveyed that the Company's guidance was still realistic "given the strong backlog" in Otis China, stating:

> If you think about it, backlog in Otis will end the year up about 13% year-over-year, and we'll convert probably 60% or 70% of that into sales. So as we start the year in a flat market, you would expect kind of 7% or 8% kind of growth in Otis China. . . . But again, I think there is a pathway towards double digit if we see any recovery. We've seen some stimulus measures take hold, seen some bank lending regulations ease a little bit to try and, again, reinvigorate the property market. So I wouldn't give up on this. I think there's still opportunity there. ***But again, just given the strong backlog that we ended the year. I feel pretty optimistic we're going to continue to see growth in China.***

126. Analysts relied on the Company's assurances that despite the foreign-exchange related revision to its annual guidance, the Company's financial projections were attainable and had a reasonable basis. For example, a January 27, 2015 Deutsche Bank report noted that "***The***

***company stressed that the lower guidance was due entirely to FX translation and see the base business on track with the December plan***." Similarly, a January 27, 2015 J.P. Morgan Report noted that despite the revision to UTC's annual guidance "due to 30 cents of pressure from currency and pension expense, two non-operational items . . . ***there were no adverse changes in underlying business trends since the December guidance meeting and the organic growth outlook is intact***." With respect to aftermarket sales, a January 27, 2015 RBC report noted: "Not much you can do about FX. UTX has major overseas operations, so short of spinning Otis and CS+S, there is not much that can be done about FX. ***Looking at the operations, we expect the aero aftermarket to progress from here***. . . ."

127. Further Sterne Agee analysts explained that "the new 2015 EPS guidance walk is as follows: +$0.72 per share from growth and margin improvements in all segments; ($0.19) from pension given lower discount rate and asset performance; ($0.33) from foreign exchange (F/X); and (~$0.07) from increased taxes/other; equals ~$6.95 per share which is the new mid-point of EPS guidance." Thus, analysts believed, as Defendants conveyed, that UTC's downward revision in guidance was based exclusively on the pension, foreign exchange and tax issues, and that business segment growth continued to contribute positively to the Company's earnings estimates.

128. Defendants' statements set forth above in ¶¶ 121-125 representing that the Company was on track to meet its previously announced FY2015 earnings guidance (as adjusted for foreign exchange and pension headwinds) were materially false or misleading when made because, for the reasons stated in ¶¶ 116-117, the Company's FY2015 earnings guidance was based on unreasonable and untested assumptions about the Company's projected growth, material facts which the Company failed to disclose to investors.

129. Defendants' statements identified above in ¶¶ 121-125 concerning the Company's FY2015 earnings guidance were also materially false or misleading when made for the reasons set forth above in ¶ 118, including that, as set forth above in ¶¶ 72-77, 87-89, Defendants failed to disclose UTAS's reliance on the unsustainable practice of pulling in sales from future periods, and the recording of false or fake orders and specially approved orders at Otis, to meet earnings targets.

130. Defendants' statements set forth above in ¶¶ 122-123, 125 concerning the health of UTC's underlying business and business fundamentals and topline momentum, including based on its purported "solid" and "strong backlog" at Otis China, and denying any change in the trends Defendants were seeing in UTAS commercial aftermarket sales, were materially false and misleading because: (i) as set forth above in ¶¶ 35-47, 48-51, and 94-100, former employees confirmed that UTAS had experienced significant declines in commercial aftermarket sales prior to and during the Class Period, which were made known to management during monthly meetings; (ii) as set forth above in ¶¶ 72-77, 87-89, UTC relied on a long-standing, albeit undisclosed and unsustainable practice of pulling in sales from future periods at UTAS, and the recording false or fake orders and specially approved orders at Otis, to meet earnings targets; (iii) as set forth above in ¶¶ 78-86, Otis China experienced a substantial decline in new orders prior to and during the Class Period, and a two to three point slowdown in backlog conversion rates; and (iv) as set forth in ¶¶ 87-89, Otis' backlog consisted of false or fake orders and specially approved orders.

### C. February 18, 2015 Barclays' Industrial Select Conference

131. On February 18, 2015, speaking at the Barclays' Industrial Select Conference, Defendant Hayes affirmed that the Company was "***on the right track***" to meet its revised guidance, and professed his "confiden[ce]" that UTC would be able to meet its targets.

132. Defendant Hayes also represented that, ***"I think you're going to see the commercial businesses [i.e., including Otis] grow 5% to 6% organically, and that's not all the way up. But it's -- I think it's certainly achievable, given the backlogs, the order rates that we've seen."***

133. Defendants' statement set forth above in ¶¶ 131-132 confirming that the Company was on track to meet its previously announced FY2015 earnings guidance (as adjusted for foreign exchange and pension headwinds) were materially false or misleading when made because, for the reasons stated in ¶¶ 116-117, the Company's 2015 earnings guidance was based on unreasonable and untested assumptions about the Company's projected growth, material facts which the Company failed to disclose to investors.

134. Defendants' statements identified above in ¶ 131 concerning the Company's FY2015 earnings guidance were also materially false or misleading when made because, as set forth above in ¶¶ 72-77, 87-89, Defendants failed to disclose UTAS's reliance on the unsustainable practice of pulling in sales from future periods, and the recording of false or fake orders and specially approved orders at Otis, to meet earnings targets.

135. Defendants' statements set forth above in ¶ 132 that the Company's FY2015 financial targets were achievable given the Company's existing backlogs and order rates were materially overstated for the reasons set forth in ¶¶ 119-120, 130.

**D. 2015 Annual Investor and Analyst Meeting**

136. The Company held its 2015 annual investor and analyst meeting on March 12, 2015. During the meeting, Defendant Hayes emphasized that the Company was still on track to meet its FY2015 earnings guidance, stating that there was "***no change***" to the core operational guidance the Company unveiled in December 2014 (as revised in January 2015 for foreign exchange and pension headwinds).

137. Defendants also independently professed their confidence in the Company's ability to meet UTC's guidance. For example, Defendant Gitlin, President of UTAS stated that "***[w]e are very confident in our continued growth prospects***. ***And this year, even though we are a bit back-end loaded, we're still confident in our full year expectations and our ability to deliver another strong year at UTC Aerospace Systems***." In summation, Defendant Johri emphasized that the "key message" for investors was that the Company was presently on track to achieve its FY2015 financial guidance, stating, "***[y]ou heard from all the Presidents their degree of confidence in achieving the 2015 outlook, and we are reaffirming that today***."

138. Further commenting on the Company's purported expectation that commercial aftermarket sales would be stronger in the second half of the year, Defendant Gitlin stated:

> ***First, we expect stronger commercial aftermarket in the second half of the year, primarily because provisioning is back-end loaded***. Remember that 2014 was a particularly strong year for us for provisioning because of the 787, which was particularly strong in the first half of 2014, so it's a tough comparator. Some of you may recall, and I know a couple of you visited us after this second quarter, and we had provisioning orders in the second quarter of 88% for a book and ship business. ***Now given that there are fewer new 787 operators this year, provisioning sales will be primarily driven by the A350 and the A320neo initial provisioning, both of which are naturally back-end loaded based on the delivery of the aircraft***.

139. During the meeting, Defendants also provided investors with a segment-by-segment update on the Company's performance relative to the FY2015 guidance. With respect to UTAS, Defendant Gitlin stated that "[c]ommercial aftermarket fundamentals ***are strong***" and "we should see ***continued*** strong commercial aftermarket growth."

140. With respect to Otis, Defendant Darnis stated that "***the Otis trajectory is turning positive***," and that "***I feel good that, overall, for the year, we're going to end up in our mid-single-digit [sales growth] range***." Explaining the basis for his purported confidence in the Company's ability to meet its guidance for Otis, Defendant Darnis stated, "***since we exited '14 and came into '15 with a backlog that is up double digits, we expect another solid year this***

***year***." He further added that, on "***the Otis side, we've grown 22% on new equipment over the last couple of years, better than market. The momentum on share has turned***."

141. Defendants compounded these misrepresentations during the question and answer session, downplaying the effect of certain headwinds and softness that the Company saw during the first quarter, and reaffirming the guidance in spite of these issues. For example, Defendant Gitlin had the following exchange with an unknown attendee:

> **Unknown Attendee**: Dave, a few questions on the aftermarket. Can you elaborate if you're able to identify and specifically why you think January and February have been a little bit weaker than you expected? And then in your full rate growth projection, what is the growth rate in there for the business, excluding provisioning in this year versus last year? And then lastly, on the oil price. Have you seen any actual behavioral change from the airlines as result of that? Are we still sort of logically speculating that could happen?
>
> **Gitlin**: ***Yes, I mean, we see commercial aftermarket growing in high single digits***. . . . ***And I think in terms of January and February, what we did see, we knew that provisioning was going to be light because of the [7]87***. Parts was generally okay. The input into the repair shops was a bit lighter than we expected. But that usually levels itself off, especially in the kind of climate we have now. ***So I think that the repair, first quarter may not be the kind of high single digits for the commercial aftermarket that we'll see the rest of the year, but as repair comes back, parts are doing okay. We'll start to see provisioning come in, we should be able to make it back up to that high single digits***.

142. When asked whether UTC was "starting to burn backlog in China OE" given the "[s]oft start to the year in terms of orders," and "what does that tell us about '15" and whether Defendants "expect '15 to be maybe slightly negative in China," Defendant Darnis responded:

> **Defendant Darnis**: Yes. ***So we exited with a backlog up 13% from last year in China. So we've assumed we're going to grow orders at a rate of GDP, which now in China is 6%, 7%. And with this, we get double-digit revenue growth this year.*** That depends on the conversion rates and pace of conversion rates of your backlog in -- to sell. ***If you had 0 growth this year, we'll still be about mid-single digit in revenue this year***. Of course, if we had 0 growth in orders going to '16, then we'll start having no growth on the sales side. So that's why I said we're going to watch the elevator market from an order standpoint. ***It's not really going to be an issue for this year***. It could be more an issue for next year.

143. Defendants' statements set forth above in ¶¶ 136-137 confirming that there was "no change" to the Company's previously announced FY2015 earnings guidance (as adjusted for foreign exchange and pension headwinds) and, therefore, that it was on track to meet the same, were materially false or misleading when made because, for the reasons stated in ¶¶ 116-117, the Company's FY2015 earnings guidance was based on unreasonable and untested assumptions about the Company's projected growth, material facts which the Company failed to disclose to investors.

144. The statements identified above in ¶¶ 136-137 concerning the Company's previously issued FY2015 earnings guidance were also materially false or misleading when made for the reasons set forth above in ¶ 118, including that, as set forth above in ¶¶ 72-77, 87-89, Defendants failed to disclose UTAS's reliance on the unsustainable practice of pulling in sales from future periods, and the recording of false or fake orders and specially approved orders at Otis, to meet earnings targets. For this reason, Defendants' statements identified in ¶¶ 137-138, 141 that commercial aftermarket sales would be "back end loaded" were also materially false and misleading, as Defendants concealed that UTAS's practice of pulling in sales from future periods meant that it was pulling in sales from the very periods that Defendants claimed would offset the slower first half.

145. Defendants' statements identified above in ¶¶ 136, 139-140, 142 regarding the health of UTC's underlying businesses and business fundamentals, including the purported "strong" commercial aftermarket fundamentals at UTAS, double digit backlog coming into 2015, and trajectory turning positive at Otis, were materially false and misleading and omitted material information concerning the attainable level of growth for the reasons set forth above in ¶¶ 119-120, 130.

146. Defendants' statements identified above in ¶¶ 137-138, 141 regarding commercial aftermarket provisioning at UTAS, including that Defendants expected January and February to be light, given comparisons to last year's 787 provisioning, that they would start to see provisioning come in, and that they still expected high single digit growth, were materially false and misleading because Defendants knew and failed to disclose that UTAS's BD&S group developed a comprehensive, bottom-up growth plan for FY2015 that targeted low to mid-single digit growth, based on, among other things, provisioning for Boeing's 787 platform ending in FY2014; (ii) the plan demonstrating that Boeing 787 provisioning would not continue at the same pace in FY2015, as it had in FY2014 was presented to Defendant Gitlin and other UTAS executives; (iii) the FY2015 low to mid-single digit growth target was presented to Defendant Gitlin and other UTAS executives and supported by numerous slides and back-up slides of data; and (iv) UTAS and/or UTC executives rejected this plan in favor of the high single digit growth target conveyed to the market (*see* ¶¶ 68-70).

147. Analysts seized upon the Company's affirmation of its FY2015 EPS guidance in spite of these issues. For example, RBC analysts noted that:

> Aero aftermarket sales have started the year a bit soft, and UTX has more pressure from FX in 1H. TAS has a tough comp from 787 provisioning in this period, but A350 and the A320 NEO provisioning should come through in the second half.

Despite these headwinds, the analysts noted that "UTX reiterated its EPS guidance for 2015."

148. Sterne Agee analysts similarly noted that, while 1Q15 was soft, the "2015 EPS guidance was maintained at $6.85-$7.05 reflecting 0%-3% growth."

**E. March 18, 2015 Bank of America Merrill Lynch Global Industrials Conference**

149. On March 18, 2015, at the Bank of America Merrill Lynch Global Industrials Conference, Defendants again confirmed that the Company was "on track" to meet its 2015

financial guidance, with Defendant Johri expressly stating that, "***2015 is on track of what we said in January***" and that "***operationally, everything, as we expected, things moving along exactly in line with what we thought***."

150. When asked by Bank of America Merrill Lynch analyst Ronald Jay Epstein about the viability of the Company's guidance relative to Otis given the economic downturn in China, Defendant Johri dismissed such concerns as not impacting the 2015 guidance, stating the following:

> **Epstein**: [W]hat is UTC seeing in China? The construction data seems to look weaker. And how is that going to impact the backlog at Otis? And how do you think that's going to go for expansion [ph] there?
>
> **Johri**: Yes, construction data looks a little weaker, and it's probably natural for that to happen. ***It's not an issue for 2015 as much***. We came into the year with a 13% increase in backlog at Otis for new equipment. That, based on the normal conversion rate of that new backlog into sales, would generate about mid-single-digit, 5%, 6%, 7% type of organic growth in 2015, right? ***So the backlog converting into sales, the projects we'll finish will do that***. The remaining growth -- we were shooting for 10% growth in Otis in China for this year. The remaining has to come from orders during the current year and the normal conversion that happens within the -- with the within-year orders, right? ***So if we have 0 order growth, but we still get some orders, there will be some element of that converting into sales growth. So it's not whether we get 10% or we are a little shy of that this year at Otis, not a big deal.***

151. Defendants' statements set forth above in ¶ 149 confirming that the Company was "on track" to meet its previously announced FY2015 EPS guidance (as adjusted for foreign exchange and pension headwinds), and that operationally, everything was "exactly in line" with expectations, were materially false or misleading when made because, for the reasons stated in ¶¶ 116-117, the Company's FY2015 earnings guidance was based on unreasonable and untested assumptions about the Company's projected growth, material facts which the Company failed to disclose to investors.

152. The statements identified above in ¶ 149 concerning the Company's FY2015 earnings guidance were also materially false or misleading when made for the reasons set forth above in ¶ 118, including that, as set forth above in ¶¶ 72-77, 87-89, Defendants failed to disclose UTAS's reliance on the unsustainable practice of pulling in sales from future periods, and the recording of false or fake orders and specially approved orders at Otis, to meet earnings targets.

153. Defendants' statements set forth above in ¶ 150 concerning the impact of China's weaker construction market on Otis' ability to grow its business and convert existing backlog were also materially false and misleading for the reasons set forth above in ¶¶ 119-120, including that, as set forth above in ¶¶ 78-89, Otis China experienced a substantial decline in new orders prior to and during the Class Period, and a two to three point slowdown in backlog conversion rates due to the credit availability issues in the China market, and Otis' backlog consisted of false or fake orders and specially approved orders.

**F. First Quarter 2015 Earnings Call**

154. On April 21, 2015, the Company reported its first quarter 2015 financial results, which included sales of $14.5 billion, representing 3% organic growth over the prior year. On the basis of these results, the Company confirmed that it was on track to meet the previously issued FY2015 EPS guidance of $6.85 to $7.05. In a press release accompanying the earnings announcement, Defendant Hayes stated: "We had a good start to the year. . . . ***The fundamentals of all of our businesses remained solid***, continuing to drive strong organic sales growth and allowing us to increase EPS by 13 percent on a constant currency basis, excluding the impact of gains and restructuring." The press release continued:

> "Although commercial aerospace aftermarket growth was slower in the quarter than we anticipate for the year," Hayes added . . . ***We remain confident in our expectations of 3 to 5 percent organic top line growth and sales of $65 to $66***

> ***billion, and this continues to support our earnings per share guidance of $6.85 to $7.05 in 2015***."

155. During a conference call with analysts and investors on this date, Hayes reiterated that the Company's first quarter results kept the Company on track to meet its 2015 guidance, stating: "For the full year, ***we continue*** to expect earnings per share of $6.85 to $7.05."

156. Defendant Johri also sought to reassure investors that despite challenges facing UTAS, the Company's guidance remained intact, stating:

> As Dave Gitlin said in March, UTX Aerospace Systems had a soft start to the year in the commercial aftermarket, where sales were up 4%. This was driven mainly by a tough prior year compare on provisioning, but parts sales were strong, up 12% in the quarter. . . . ***In spite of the slow start, we continue to be encouraged by the strong fundamentals of sustained 5% to 6% air traffic growth and healthy airline profitability projections***.

157. With respect to Otis, Defendant Johri added:

> ***I think because of the backlog that has come into the year, the China business will still grow this year***. Service business continues to grow very nicely, grew almost 20% again this quarter. ***So yes, a little shy of the expectations on new equipment in China, but the strength in the Otis Europe new equipment orders should hopefully offset a little bit of that and America continues to be strong***. So we are watching those 2 items, the pricing pressure in Europe and the China new equipment market, ***but broadly, we still feel we can get to the low end of the range at least.***

158. Defendants' misrepresentations and omissions ensued when responding to analysts during the question and answer portion of the call. Specifically, when asked by Credit Suisse analyst Julian C.H. Mitchell, whether "you still think in Q2 we could see low single-digit commercial aftermarket sales growth," Defendant Hayes stated:

> "***Yes, Julian, I think, again, the -- we expect an improving aftermarket as we go through the year***. And again which we talked about, with these lower oil prices that phenomenon should play out even more strongly, I think, in the back half of the year as it takes 6 months or so to get people to change purchasing behavior. ***But again, I think it's all kind of out there within the guidance***. It started out slow. Dave Gitlin, I think, talked about that for Aerospace Systems group back in March, kind of a slow start. ***But again, all the signs are there***. The RPMs

> continue to be very strong especially in the emerging markets and ***we expect we'll see the engines come back and we'll see the parts go out the door***.

159. Further, when asked by Barclays analyst Phillip Carter Copeland whether the Company was "seeing any change in the backlog conversion," Defendant Johri responded:

> ***No, that still feels okay***. And I think as Geraud said in March, ***just the conversion of the backlog into sales this year should give you about 5% to 8% -- 5% to 6% of sales growth*** and then it'll all be a function of how many orders we get this year and how much of that gets converted. And that's the math which will give the ultimate new equipment sales in China.

160. Analysts relied on Defendants' assurances that the Company was on track to meet its annual guidance on the basis of its first quarter 2015 performance. For example, an April 21, 2015 report by Jefferies highlighted that the company was "***on track to meet its 3% to 5% growth forecast for the year***." Similarly, an April 21, 2015 Deutsche Bank report noted that UTC's guidance was "***unchanged despite headwinds***." Deutsche Bank analysts further noted that, despite these headwinds, "the company reiterated full year EPS of $6.85 - $7.05 which is encouraging as we had been thinking that the top end could be dropped a touch" and maintained its "buy" rating on the stock.

161. In an April 21, 2015 report, RBC analysts likewise noted that there was "No change to outlook," and explained: "Although UTX management notes that the aero aftermarket was slower in the quarter than anticipated for the full year . . . [m]anagement reiterated guidance for 2015 sales of $65-66bn (+3-5% organic), with EPS of $6.85-$7.05." In a similar report the next day, RBC analysts again noted that "***Overall guidance maintained, despite pressures***," and that while "UTX had flagged a slower start to the aerospace aftermarket . . . ***management expects aftermarket growth to accelerate from here***." Indeed, "[m]anagement noted . . . [that] aftermarket trends could be positive offsets. . . ."

162. In an April 21, 2015 report, Sterne Agee analysts noted that the 2015 guidance was "intact" and that the "2015 EPS guidance was maintained in the range of $6.85-$7.05," as did UBS analysts, who similarly commented on April 21, 2015 that UTC was off to a "strong start" and "maintained its EPS guidance at $6.85-7.05." In a May 6, 2015 report, UBS further noted that "key themes from our recent management visit included: confidence in 2015 view despite what looks like incremental downside out of China (Otis)."

163. Defendants' statements set forth above in ¶¶ 154-155 confirming that the Company was on track to meet its previously announced FY2015 earnings guidance (as adjusted for foreign exchange and pension headwinds), including with respect to UTAS, were materially false or misleading when made because, for the reasons stated in ¶¶ 116-117, the Company's FY2015 earnings guidance was based on unreasonable and untested assumptions about the Company's projected growth, material facts which the Company failed to disclose to investors.

164. The statements identified above in ¶¶ 154-155 and 158 concerning the Company's FY2015 earnings guidance, including Defendants' purported expectation for "an improving aftermarket as we go through the year," were also materially false or misleading when made because, as set forth above in ¶¶ 72-77, Defendants failed to disclose UTAS's reliance on the unsustainable practice of pulling in sales from future periods to meet earnings targets, and for the reasons set forth above in ¶ 146.

165. Defendants' statements identified above in ¶¶ 154 and 156 regarding the health of UTC's underlying businesses and business fundamentals, including the purported "solid" fundamentals of "all" of its businesses, despite a soft start to the year in the commercial aftermarket, were materially false and misleading and omitted material information, for the reasons stated in ¶¶ 130, 146.

166. The statements identified above in ¶¶ 154-155, 157 and 159 concerning the Company's FY2015 earnings guidance were also materially false or misleading when made because, as set forth above in ¶¶ 87-89, Defendants failed to disclose Otis's reliance on the unsustainable practice of recording false or fake orders and specially approved orders to meet earnings targets.

167. Defendants' statements set forth above in ¶¶ 157 and 159 affirming the Otis' ability to grow in China based on its backlog coming into the year, and denying any changes in its backlog conversion rate were also materially false and misleading for the reasons set forth above in ¶¶ 119-120.

**G. May 19, 2015 Electrical Products Group Conference**

168. Defendant Hayes again confirmed that the Company was on track to meet its FY2015 guidance at the Electrical Products Group Conference on May 19, 2015, stating:

> ***Just really before we get into the meat of the presentation I wanted to just take a second and reaffirm UTC's overall guidance for 2015***. And that is sales of about $65 billion to $66 billion. It's organic growth of 3% to 5%, EPS in the range of $6.85 to $7.05, and free cash flow between 90% and 100% of net income, as we typically do. ***So no surprises there***.
>
> We are not going to go into the individual business unit guidance today. We will update that over the course of the next couple of months, but ***suffice it to say we are very comfortable with UTC level with guidance for the year.***

169. In response to question regarding "the latest on volumes, price, and competitive landscape" in Asia and China, Defendant Hayes stated that while orders in China were down during the first quarter of 2015:

> ***I'm actually not that concerned about 2015 for UTC in China, because the backlog was strong enough coming into the year to give us confidence we will see the sales.*** In fact, we did see about 5% sales growth in the first quarter, even though orders were down.

170. Defendants' statements set forth above in ¶ 168 confirming that the Company was on track to meet its previously announced FY2015 earnings guidance (as adjusted for the foreign exchange and pension headwinds), were materially false or misleading when made because, for the reasons stated in ¶¶ 116-117, the Company's FY2015 earnings guidance was based on unreasonable and untested assumptions about the Company's projected growth, material facts which the Company failed to disclose to investors.

171. The statements identified above in ¶ 168 concerning the Company's FY2015 earnings guidance were also materially false or misleading when made because, as set forth above in ¶¶ 72-77, 87-89, Defendants failed to disclose UTAS's reliance on the unsustainable practice of pulling in sales from future periods, and the recording false or fake orders and specially approved orders at Otis to meet earnings targets.

172. Defendants' statements set forth above in ¶ 169 affirming the Otis' ability to grow in China based on its "strong" backlog coming into the year, despite first half orders being down "significantly," were also materially false and misleading for the reasons set forth above in ¶¶ 119-120.

### H. June 4, 2015 Deutsche Bank Global Industrials and Basic Metals Conference

173. On June 4, 2015, speaking at the Deutsche Bank Global Industrials and Basic Metals Conference, Defendant Johri represented to investors that "***[o]n the commercial aerospace side we expected a slower start to the aftermarket business in the first half***," and that the Company remained on track to meet its 2015 guidance, stating that "***overall, still feel good about where we are on the outlook for organic growth for the current year. Now guidance for the year, still $65 billion to $66 billion on top line, $6.85 to $7.05 for earnings per share and cash flow in the 90% to 100% of net income level, right? So no change there***."

174. Analysts relied on Defendant Johri's representations, as evidenced by a June 4, 2015 Deutsche Bank report that listed the number one takeaway from the Company's presentation as being that "[Management] reiterated all forms of guidance."

175. Defendants' statements set forth above in ¶ 173 confirming that the Company was on track to meet its previously announced FY2015 earnings guidance (as adjusted for the foreign exchange and pension headwinds), despite a slower start to commercial aftermarket sales, were materially false or misleading when made because, for the reasons stated in ¶¶ 116-117, the Company's FY2015 earnings guidance was based on unreasonable and untested assumptions about the Company's projected growth, including that UTAS had been experiencing deteriorating commercial aftermarket sales prior to and throughout the Class Period, material facts which the Company failed to disclose to investors.

176. The statements identified above in ¶ 173 concerning the Company's FY2015 earnings guidance were also materially false or misleading when made because: (i) as set forth in ¶ 146, Defendants knew and failed to disclose that provisioning for Boeing's 787 aircraft would not continue at the same pace in FY2015 as it had in FY2014; and (ii) as set forth above in ¶¶ 72-77, Defendants failed to disclose UTAS's reliance on the unsustainable practice of pulling in sales from future periods to meet earnings targets. For this reason, Defendants' representations that they had expected a slower start to the year for commercial aftermarket sales was also materially misleading, as Defendants concealed that UTAS's practice of pulling in sales from future periods meant that it was pulling in sales from the very periods that Defendants claimed would offset the slower first half.

### I. June 15, 2015 Paris Air Show Analysts and Portfolio Managers Meeting

177. On June 15, 2015, the Company announced its intention to divest its Sikorsky operations. With the impending removal of Sikorsky (and its revenues) from UTC's continuing operations, the Company issued adjusted FY2015 guidance ***solely*** to reflect the Company's continuing operations, which affirmed the guidance for the Company's other divisions. In a press release, the Company stated:

> ***Excluding Sikorsky, UTC now expects 2015 earnings per share of $6.35 to $6.55 on sales of approximately $58 to $59 billion. The company continues to expect organic sales growth of 3 to 5 percent*** and cash flow from operations less capital expenditures in the range of 90 to 100 percent of net income attributable to common shareowners.
>
> Including Sikorsky, the company now anticipates earnings per share of $6.55 to $6.85, down from the previous expectation of $6.85 to $7.05. This reduction in the earnings expectation range reflects approximately $0.10 to $0.20 of one-time separation costs along with a $0.10 decline in Sikorsky's operational expectations for the year due to weakness in the oil and gas markets.

178. Defendants reaffirmed the Company's guidance with respect to its continuing operations during a presentation at the Paris Air Show on this date, thus confirming, once again, that UTC was on track to meet these goals. Speaking on behalf of UTAS, Defendant Gitlin acknowledged that weaker-than-expected UTAS commercial aftermarket sales for the first half of the year were "putting a little bit of pressure on the low-end" of UTAS's FY2015 earnings guidance, but assured investors the Company was "being tenacious on cost reduction to help offset that headwind as much as possible," and that the Company still expected UTAS's aftermarket sales "to pick up in the back half of the year."

179. Defendant Johri walked investors through the Company's guidance, again affirming the previously issued FY2015 guidance (excluding Sikorsky):

> ***2015 expectations, this is just the roadmap you have seen before.*** When we started the year we were looking at a[n] EPS guidance in January of $6.85 to

> $7.05, a midpoint of $6.95. $0.57 or 8% earnings growth from the business segments. Unfortunately a lot of that going away in form of the FX headwind, $0.33, our euro outlook $1.10 which seems reasonable at this point in time. Pension headwind of $0.19 and some good news through higher and accelerated share buyback that we did there. So in that guidance of $6.95, Sikorsky's outlook was about $0.50 of EPS.
>
> So let's just reconcile that to what Bob just said. The continuing operations at some point Sikorsky will move into discontinued operations depending on whether it is a sale or a spin, the timing will change but $58 billion to $59 billion for UTC ex-Sikorsky; $6.35 to $6.55, ***we still expect organic growth of 3% to 5%*** and free cash flow to net income of 90% to 100%. Add back Sikorsky's revised expectations, about $6.5 billion in sales, $0.40 in earnings and then we've got a placeholder of $0.10 to $0.20; $0.10 if there is a sale, $0.20 if there is a spin by the end of the year. ***In that scenario just the math of the new GAAP guidance if you will would be $64.5 billion to $65.5 billion of sales and $6.55 to $6.85 of EPS range on a reported GAAP basis.***

180. Defendant Hayes likewise affirmed the continued viability of the guidance, stating: "Akhil took you through the guidance for the year. ***I don't think there are any surprises there***." In addition, Defendant Gitlin stated that "***We had already expected as I told you in March for commercial aftermarket to be back-end loaded in the year*** and that was really based on initial provisioning orders projected to pick up in the back half of the year on the A320neo and A350 ***and we still expect that to be the case***."

181. Analysts again relied on Defendants' representations, associating the guidance revision with Sikorsky pressures. For example, Morningstar stated that the June 15, 2015 announcement that UTC was selling its Sikorsky business "coincided with a reduction in 2015 earnings guidance, as Sikorsky continues to experience pressure from a weakened oil and gas market and reduced military spending. Furthermore, management expects $0.10-$0.20 per share of one-time separation charges to hit the income statement in 2015." Similarly, Sterne Agee analysts noted that "2015 EPS guidance was reduced to $6.35-$6.55 . . . which reflects the decision to exclude Sikorsky earnings of $0.40 per share plus the separation one-time costs."

Moreover, in light of Defendants' assurance, the analysts noted that management's comments regarding slower aftermarket growth at UTAS, "***points to the low-end of current guidance***."

182. Defendants' statements set forth above in ¶¶ 177-180 confirming that the Company was on track to meet its FY2015 guidance (as adjusted for the foreign exchange and pension headwinds and the divestiture of Sikorsky), despite slower aftermarket growth at UTAS and "some pressure on Otis," were materially false or misleading when made because, for the reasons stated in ¶¶ 116-117, the Company's FY2015 earnings guidance was based on unreasonable and untested assumptions about the Company's projected growth, including that UTAS had been experiencing deteriorating commercial aftermarket sales prior to and throughout the Class Period, material facts which the Company failed to disclose to investors.

183. The statements identified above in ¶¶ 177-180 concerning the Company's FY2015 earnings guidance were also materially false or misleading when made because: (i) as set forth in ¶ 146, Defendants knew and failed to disclose that provisioning for Boeing's 787 aircraft would not continue at the same pace in FY2015 as it had in FY2014; and (ii) Defendants failed to disclose UTAS's reliance on the unsustainable practice of pulling in sales from future periods to meet earnings targets. For this reason, Defendants' statements identified in ¶¶ 178 and 180 that commercial aftermarket sales would be "back end loaded" and "pick up in the back half of the year" were also materially false and misleading because, as set forth above in ¶¶ 72-77, Defendants concealed that UTAS's practice of pulling in sales from future periods meant that it was pulling in sales from the very periods that Defendants claimed would offset the slower first half.

## VI. LOSS CAUSATION

184. Defendants' material misrepresentations and omissions alleged herein concerning UTC's FY2015 EPS guidance and its ability to meet the same caused the price of UTC common

stock to be artificially inflated and/or maintained such artificial inflation throughout the Class Period, thereby operating as a fraud or deceit upon Lead Plaintiff and other putative class members who purchased or otherwise acquired UTC common stock during the Class Period.

185. In reliance upon public information disclosed by and relating to UTC, as well as the integrity of the market price for UTC common stock, Lead Plaintiff and other putative class members purchased or otherwise acquired UTC common stock during the Class Period at artificially inflated prices that incorporated and reflected Defendants' material misrepresentations and omissions alleged herein. Lead Plaintiff and other putative class members suffered actual economic loss and were damaged by Defendants' misrepresentations and omissions, when the truth concealed by Defendants' misrepresentations, was revealed through a series of disclosures on June 15 and July 21, 2015.

186. Specifically, on June 15, 2015, before the New York markets opened, Defendant Gitlin partially revealed at the Paris Air Show that there was risk to the UTAS's ability to meet its FY2015 guidance of $225 to $275 million in EBIT for the year, stating that commercial aftermarket sales in the first half of the year were weaker than expected and put "a little bit of pressure on the low-end of [the] EBIT guidance." Defendant Johri similarly revealed that UTC had not "seen any improvement in the trends in the Otis new equipment business in terms of orders, the orders continue to be down year-over-year off what should have been easier compares," and that this "incremental bad news" put "some pressure on Otis," but that "we will see how things progress over the next few weeks and update [investors] again at [UTC's] earnings call in about six weeks or so." Defendant Johri further revealed that it felt like EPS for UTC's BIS organization "could be closer to the $1.70 level" guidance that it gave back in April, but that June is a "big month" and they'd "see where it all ends up."

187. This partial disclosure caused the price of UTC common stock to drop from its closing price of $117.60 on June 12, 2015 to close at $114.61 on June 15, 2015, for a decline of $2.99 per share or 2.5%.

188. However, as set forth in paragraphs ¶¶ 177-183, above, Defendants issued false statements to investors during the Paris Air Show that prevented the full truth from being revealed to investors (and thus kept the stock price trading at artificially inflated levels). Indeed, Defendants' statements continued to misrepresent and conceal that the Company's guidance: (i) was "overly optimistic" and "way too aggressive"; (ii) lacked a "strong basis" in fact; (iii) would need to be revised downward; and (iv) was not sufficiently vetted by management before it was issued. In fact, Defendants admitted that by June 15, 2015 they had already determined that they "could" have revised downward the guidance but apparently chose not to, and once again failed to disclose UTC's reliance on the unsustainable practice of pulling in sales.

189. On the morning of July 21, 2015, the full truth was revealed and the risks concealed by Defendants' fraud materialized. That day, before the market opened, UTC issued a press release announcing that it was lowering its FY2015 EPS guidance for continuing operations to $6.15 to $6.30 from its prior guidance of $6.35 to $6.55. Further, UTC revised its sales expectations from continuing operations to $57 to $58 billion, down from prior expectations of $58 to $59 billion. Defendant Hayes explained that "[w]ith six months of trends behind us, it is now clear the commercial aftermarket at UTC Aerospace Systems will be significantly below our prior expectations for the year. This, along with continuing softness in Otis Europe and a slowing China, led us to reassess our 2015 outlook for UTC Aerospace Systems and Otis."

190. During the Company's conference call that morning (also before the market opened), Defendant Hayes similarly stated that "[a]fter half a year of actual results, it's clear that the ***commercial aftermarket assumptions that our Aerospace Systems business used were overly optimistic***. And this, along with continuing weakness in Otis Europe and a significant slowdown of construction markets in China, it [caused] us to reevaluate our outlook for these 2 segments." Defendant Johri further explained that, the UTAS aftermarket provisioning "now looks to be down about 10% versus our prior expectation of 10%" growth, while at "Otis new equipment orders in China were down 10% in the quarter" (compared to UTC's assumption of 5% growth), and UTC "saw a slowdown in the rate of backlog conversion" in China by two to three points.

191. In addition, Defendant Hayes ***admitted*** that the assumptions used in devising the forecasts were baseless and unvetted. For example, with respect to UTAS commercial aftermarket assumptions, he admitted that "when we came off of 2 very, very strong years of provisioning growth, ***I think we just assume[d]*** that we were going to continue to see that kind of growth" and did not "***delve[] deep enough*** into – [] ***didn't question*** enough the assumptions underlying how [we] were going to get there," and simply "didn't think deep enough last year when these plans were getting put together."

192. Ultimately, Defendant Hayes admitted that "we were ***way too aggressive in terms of our assumptions*** for the provisioning of spare items" and conceded that:

> [T]he root cause is we pushed the Aerospace Systems guys to have a plan that was going to be up roughly $300 million for the year. And in order to do that, they had to push the aftermarket guys to deliver a much bigger number. And at the end of the day, ***I don't think there was a strong basis in that aftermarket assumption around how we were going to get there.***

193. Similarly, Defendant Hayes admitted that "we just got ***way too aggressive*** on the aftermarket at UTAS and the European recovery that hasn't happened."

194. Notably, when questioned as to why Defendants had not reduced guidance sooner, Defendant Hayes admitted that they could have, but claimed that they "wouldn't have taken it down enough" because they were still "***hoping for some recovery***." As one analyst commented, however, "hope is not a strategy."

195. These disclosures caused a substantial decline in the price of UTC common stock and had the effect of removing the artificial inflation baked into UTC's common stock price during the Class Period as a result of Defendants' fraud.

196. In response to the above disclosures (¶¶ 189-194), UTC's stock price dropped $7.77 per share, or 7.03 percent, to close at $102.71 on July 21, 2015, on heavy trading volume of 19,540,100 shares.

197. Further, analysts attributed the stock price reaction on this date to the Company's lowering of its EPS guidance and Defendants' admissions that they did not actually investigate whether the guidance had a valid basis when issued.

198. In a report issued after the Company's press release hit the wires on July 21, 2015, Deutsche Bank analysts stated, "***Guidance was the big negative from the report***" and that the "***cut was bigger than we'd have expected and would expect the stock to be down 3%+ on the day***." Similarly, RBC noted pre-call that:

> ***Although UTX cautioned on the UTAS aftermarket and Otis at the Paris Airshow, the cut to 2015 guidance is significantly larger than we had expected*** . . . . To us, improved aero aftermarket growth, led by UTAS, has been one of the key attractions of UTX, together with strength in its North American industrial markets. ***With the aero aftermarket now failing to deliver, and Europe and China still not looking good, there is not a lot of organic attraction in UTX at the moment***."

199. Following the conference call during which Defendants admitted that their guidance lacked a reasonable basis, RBC reported that "***Comments from UTX management suggest that this was more of an issue of overly aggressive forecasts at the start of the year***."

Similarly, Morningstar stated: "***Conceding earlier overconfidence in both UT Aerospace Systems . . . United Technologies decreased full-year revenue and profitability guidance, causing a market selloff of UTX shares***." Deutsche Bank analysts further noted that "the size of the UTAS miss looks company specific (20% miss to provisioning estimates)." In a July 22, 2015 report, Sterne Agee stated that "[t]he [UTAS guidance] reset was ***materially different than expectations***" and that "***this one is on management for too aggressive growth assumptions***."

200. In the wake of Defendants' admissions that they had misled investors with the Company's unrealistic guidance, analysts also commented on management's loss of credibility. For example, following the Company's conference call, Deutsche Bank analysts chastised Defendants in a report titled "***Hope isn't a strategy***," and downgraded the stock. Similarly, in a report on July 22, 2015, RBC asked "What went wrong?" and noted that "Greg Hayes's honeymoon period as CEO appears to be over now. UTX's medium-term organic outlook seems average, and ***after the 2015 guidance cut, investors are likely to have less faith in management's forecasts and potentially M&A judgment going forward***." Similarly, UBS noted on July 22, 2015 that "***the magnitude of the cut to UTAS was a major surprise***" and concluded that "***it will likely take some time to rebuild the credibility lost with this latest cut***."

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

201. Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or ultimate authority over UTC's materially false and misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in ¶¶ 107-183 above were materially false and misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above in ¶¶ 48-70 and 94-100 regarding

Defendants' personal knowledge and/or reckless disregard of the material misrepresentations and omissions alleged herein, Defendants' scienter is further evidenced by the following facts.

### A. Defendants' Responsibility for the Erroneous Forecasts

202. The Individual Defendants each had a substantial role in issuing and/or confirming that the Company was on track to achieve the FY2015 earnings guidance they publicly touted, and were responsible for understanding the basis for the assumptions relating thereto. As Defendant Hayes ultimately admitted, the forecasts and earnings miss "all ultimately falls on me," as it's "my responsibility to make sure that the forecast we put together are the right forecasts." Further, according to Defendants Hayes, Bellemare, Gitlin and Darnis "own[ed]" the plans for their respective organizations and, thus, knew or should have known of the facts rendering the FY2015 earnings guidance materially misleading—including that UTAS's commercial aftermarket assumptions were "too aggressive" and without a "strong basis."

### B. Defendants' Receipt of and/or Access to Information Undermining the Unreasonable Financial Guidance

203. The Individual Defendants also received and/or had access to detailed information concerning the business operations and financial condition of the Company. The Individuals Defendants were the senior-most executives of UTC and, thus, had access to all relevant information concerning the business operations and financial condition of the Company. Further, Defendants Hayes and Johri were responsible for signing Sarbanes-Oxley certifications attesting to the accuracy of the Company's financial results and, thus, had access to information concerning UTC's business performance. In addition, on his first conference call as CEO Defendant Hayes boasted that he was "a naturally curious guy," and "ask[s] a lot of questions," "not all good," and claimed that he was "going to spend time getting to understand what's going on in the business," and "[had] been doing it . . . for 10 years." He further stated that UTC

employees were "going to be held responsible [for] be[ing] transparent with [him]" regarding the Company's numbers.

204. Defendants also knew or had access to information indicating that their plans for high single digit growth in commercial aftermarket sales was unreasonable. Specifically, FY2015 Aftermarket sales goals reflecting low to mid-single digit growth were developed by UTAS's BD&S group and presented to UTAS Aftermarket Services management, through a comprehensive, bottom-up analysis. After refinement and pressure testing, including regarding forecasted declines in provisioning sales from Boeing's 787 platform, a mid-single digit growth target, at best, was presented to Defendant Gitlin and other members of UTAS management. These targets were rejected by UTAS and/or UTC executives and revised upward to the high single digit sales growth target for UTAS commercial aftermarket services conveyed to the market (*see* ¶¶ 68-70).

205. Defendants also knew or had access to information transmitted through monthly meetings of UTC/UTAS's business units that flowed-up to the Individual Defendants, which undermined their false and misleading financial guidance and other misrepresentations and omissions. First, the following factors adversely impacting UTAS commercial aftermarket sales were discussed during monthly Operational Reviews and reported on monthly thereafter to UTC management, including Dumais and Defendants Gitlin and Bellemare: (i) commercial primes, stockpiling and selling parts directly to airlines; (ii) Boeing's PFS initiative, which slashed profit margins for UTAS commercial aftermarket sales; (iii) airlines creating alliances or collectives to buy parts, resulting in the purchase of fewer parts from UTAS at cheaper prices; and (iv) counterfeit parts being purchased in greater numbers by airlines.

206. UTC/UTAS management, including Dumais and Defendants Gitlin and Bellemare, were presented with plans from the business units, including SIS, that: (i) accounted for the above factors that were adversely impacting commercial aftermarket sales; and (ii) reflected "stretch" goals, including following a meeting in September or October 2014. UTC/UTAS senior management rejected these plans and mandated that the business units meet increased goals. For example, the plan that came down to SIS following UTC/UTAS management's review mandated that SIS generate an additional $20 million in EBIT, and resulted in sales goals for SIS's ICAMS segment being increased by 30-35%, with other SIS segments complaining about similar forecasts.

207. Moreover, when other members of senior management attempted to dispute these unrealistic numbers, Defendant Bellemare threatened their employment, stating, "get on board or we will find someone who will."

208. UTC/UTAS management participated in monthly briefings on SIS's performance against the financial goals they set for the underlying businesses. The information discussed at these monthly briefing was communicated to the highest levels of UTC/UTAS senior leadership, and ultimately to UTC senior management. Similarly, according to FE 1, when the business segments were not performing in line with their plan, SIS President Keppy required that they developed "Action Plans" to address the unit's inability to meet the targets set. In addition, each of the SIS department leads would submit a "briefing deck" explaining the cause of any negative variance to their plan to Keppy, who would consolidate the decks and submit that to Defendant Bellemare. As alleged above, during the Class Period, Keppy reported to Dumais, who reported to Defendant Bellemare, and later to Defendant Gitlin, each of whom reported directly to Defendant Hayes.

209. Former employees also revealed how information regarding the UTAS business units' inability to meet the unrealistic forecasts set by senior management was communicated up the chain of command. For example, FE 1 explained that the adverse trends affecting commercial aftermarket sales (primes stockpiling parts, Boeing's PFS initiative, airlines forming collectives, and a proliferation of counterfeit parts in the marketplace) were communicated to senior management during monthly SIS Operational reviews. According to FE 1, Keppy was responsible for briefing UTAS Senior Corporate leadership on the matters discussed at the monthly SIS Operational Reviews.

210. As revealed by FE 5, it was immediately apparent in 2015 that actual commercial aftermarket sales were not in line with the assumptions generated by senior leadership. These shortfalls were communicated up to senior leadership through the "business-in-hand" report, which was generated weekly and reported on aftermarket sales, and were circulated to executives at SIS headquarters. FE 5's team also presented its results (including sales misses) to the SIS aftermarket demand team monthly during a "demand review," which occurred during week two of a given month. FE 5 recalls that the other departments likewise presented their results (including sales misses) during the monthly demand review meetings. FE 5 explains that the sales results from FE 5's team and the other SIS segments were gathered at the beginning of week two each month, and were presented to SIS President Keppy at the end of that week.

**C. Defendants' Admissions Support a Strong Inference of Scienter**

211. Defendants' own admissions at the end of the Class Period also give rise to a strong inference of scienter. During the Company's July 21, 2015 earnings call Defendants admitted that the FY2015 EPS guidance that UTC issued was "overly optimistic" and "way too aggressive" from the start. Defendants also admitted to facts that they knew as of the beginning of the Class Period, the omission of which rendered their Class Period statements materially false

and misleading. Defendants admitted that they "pushed" the business units to meet these aggressive forecasts and deliver a "much bigger number" than they could realistically achieve. Furthermore, Defendant Hayes admitted that Defendants had no factual basis to issue the FY2015 EPS guidance, stating that: (i) the assumptions underlying the FY2015 EPS target lacked a "strong basis" in fact; and (ii) Defendants did not "delve[] deep enough" into and "didn't question enough the assumptions underlying how they were going to" meet the aggressive forecasts they set. Instead, Defendant Hayes admitted that Defendants "just assume[d] that we were going to continue to see th[e] kind of growth" that the Company had seen in prior years.

212. Defendant Hayes also admitted that Defendants "expected some pressure" on the UTAS guidance and knew they "could have" reduced the FY2015 EPS guidance or disclosed to investors that UTC would be unable to meet it ***prior to July 21, 2015***. However, Defendants omitted this highly material fact and instead falsely reaffirmed UTC's guidance (excluding Sikorsky) just weeks earlier on June 15, 2015 at the Paris Air Show.

213. As a result of the disastrous FY2015 EPS guidance, Defendant Hayes reported that he and Defendant Johri put in place a process so that they will "understand what the issues and challenges are" facing the Company and its prospects, including "doing more business reviews" and "spending more time on the road to make sure that we truly understand what's going on at these individual businesses"—things they plainly had not done when repeatedly trumpeting the misleading and "aggressive" guidance for FY2015.

## D. Core Operations

214. The importance of UTAS to UTC's financial results supports a strong inference of scienter. In 2014 and 2015 respectively, UTAS accounted for $14.215 billion (24.55%) and $14.094 billion (25.12%) of UTC's consolidated net sales (excluding Sikorsky), and $2.355

billion (24.55%) and $1.888 billion (25.89%) in operating profits (excluding Sikorsky). During the Class Period, UTAS operated a $4.5 billion commercial aftermarket business (comprised roughly of $1.5 billion in spare parts sales, $1 billion in provisioning, and $1.8 billion in repair services), while aftermarket sales generally account for 44% of UTC's consolidated net sales. Approximately 44% of UTC's consolidated net sales came from aftermarket sales during the Class Period. In 2014 and 2015, respectively, Otis accounted for $12.982 billion (22.42%) and $11.980 billion (21.36%) of UTC's consolidated net sales, and $2.640 billion (27.52%) and $2.338 billion (32.07%) in operating profits (excluding Sikorsky).

### E. Defendant Darnis' Stock Sales Support a Strong Inference of Scienter

215. Defendant Darnis was also motivated to commit fraud to reap millions in proceeds from the sale of UTC common stock—just ***one day*** after making the false and misleading statements attributed to him herein. Specifically, on March 13, 2015, Defendant Darnis exercised options and acquired more than 300,000 shares of UTC common stock (representing nearly 200% more shares than he beneficially owned prior to this acquisition), all of which he sold that same day, reaping an immediate profit of more than ***$19 million***. Defendant Darnis' transactions are as follows:

| **Number of Shares Acquired** | **Purchase Price** | **Cost** |
|---|---|---|
| 200,000 | $57.84 | ($11,568,000.00) |
| 101,500 | $56.30 | ($5,714,450.00) |
| | | |
| | Total Cost | ($17,282,450.00) |
| | | |
| **Number of Shares Disposed** | **Sale Price** | **Proceeds** |
| 150,513 | $121.2360 | $18,247,594.06 |
| 95,579 | $121.03 | $11,567,926.37 |
| 47,408 | $121.03 | $5,737,790.24 |
| 8,000 | $118.5908 | $948,726.40 |
| | | |
| | Total Proceeds | $36,502,037.07 |
| | | |
| **Profit** | | **$19,219,587.07** |

**F. UTC's Stock Buyback**

216. While Defendants repurchased billions of dollars in UTC shares during the Class Period, they did so for the purpose of ***offsetting*** the negative impact that certain business developments were having on UTC's EPS and, in turn, its ability to meet the FY2015 EPS guidance.

217. On January 26, 2015, after reporting that the FY2015 earnings guidance would be reduced from $7.00-$7.20 per share to $6.85 to $7.05 per share due to foreign exchange and pension headwinds, Defendants announced that UTC would seek to repurchase $3 billion in common stock during 2015 not because they believed the stock was undervalued, but in order to increase UTC's earnings per share by reducing the number of outstanding shares. Specifically, Defendant Johri stated that the $3 billion share repurchase would be used to "offset" the EPS impact of the foreign exchange and pension discount rate headwinds.

218. Similarly, during the company's July 21, 2015 earnings call, when Defendant Hayes finally admitted that UTC could not meet the FY2015 EPS guidance, he also announced that the Company would use the $6.2 billion in cash generated by the Sikorsky sale "to offset the EPS dilution" by repurchasing UTC common stock.

219. Defendants' admitted use of share repurchases during the Class Period to prop up UTC's reported EPS – and in the process conceal UTC's inability to meet the FY2015 EPS target through its continuing operations – is consistent with an inference of scienter.

## VIII. PRESUMPTION OF RELIANCE

220. At all relevant times, the market for UTC common stock was efficient for the following reasons:

a. UTC common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, UTC filed periodic reports with the SEC and NYSE;

c. UTC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. UTC was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

221. As a result of the foregoing, the market for UTC common stock promptly digested new material information regarding UTC from all publicly available sources and reflected such information in UTC's stock price.

222. Under these circumstances, Lead Plaintiff and all other purchasers of UTC common stock during the Class Period are entitled to a presumption of reliance in accordance with *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).

223. Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiff and all other purchasers of UTC common stock during the Class Period are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

224. The statutory safe harbor and/or bespeaks caution doctrine applicable under certain circumstances to forward-looking statements does not apply to any of the materially false or misleading statements or omissions pleaded in this Complaint.

225. Many of the statements complained of herein were not forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and business conditions at the time such statement was made. Defendants affirmed UTC's core operational FY2015 EPS guidance on multiple occasions throughout the Class Period. Each affirmation signaled that the Company continued to perform in line with expectations, such that UTC remained on track to meet its EPS target. Defendants' statements affirming UTC's EPS guidance were therefore statements of current fact to which the statutory safe harbor is inapplicable. Further, the safe harbor and bespeaks caution doctrines do not apply to the failure to disclose historical and existing material facts and the impact of those facts on the reliability of UTC's financial forecasts.

226. Defendants made additional representations regarding UTC's present financial performance and results of operations, including:

a. On January 26, 2015, Defendant Hayes stated that "***our business fundamentals and operational expectations have not changed***." Defendant Johri similarly stated that "***to make it clear, nothing has fundamentally changed in the health of the underlying businesses***."

b. On February 18, 2015, Defendant Hayes stated that the Company was "***on the right track***" to meet its revised guidance.

c. On March 12, 2015, Defendant Gitlin stated that "[c]ommercial aftermarket fundamentals ***are strong***" and "we should see ***continued*** strong commercial aftermarket growth."

d. On March 18, 2015, Defendant Johri stated that "***2015 is on track of what we said in January***" and that "***operationally, everything, as we expected, things moving along exactly in line with what we thought***."

e. On April 21, 2015, Defendant Hayes stated in a press release that "***We remain confident in our expectations of 3 to 5 percent organic top line growth and sales of $65 to $66 billion, and this continues to support our earnings per share guidance of $6.85 to $7.05 in 2015***." During a conference call on this date, Defendant Johri stated that "***In spite of the slow start, we continue to be encouraged by the strong fundamentals of sustained 5% to 6% air traffic growth and healthy airline profitability projections***."

f. On May 19, 2015, Defendant Hayes stated that "***we are very comfortable with UTX level with guidance for the year***."

g. On June 4, 2015, Defendant Johri stated that "***overall, [the Company] still feel[s] good about where we are on the outlook for organic growth for the current year***."

h. On June 15, 2015, UTC stated in a press release that "***[t]he company continues to expect organic sales growth of 3 to 5 percent***." During a conference call on this date, Defendant Johri repeated this representation, stating that "***2015 expectations, this is just the roadmap you have seen before***."

227. To the extent any of the foregoing statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

228. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement and/or failed to completely eliminate the risks concealed by the false or misleading statements alleged herein.

229. To the extent Defendants included any cautionary language to accompany their statements, such language was not meaningful because any potential risks identified by Defendants had already manifested.

230. As alleged above in detail, then-existing facts contradicted Defendants' statements touting and reaffirming UTC's FY2015 EPS guidance, and were known to Defendants at the time such statements were made, including that UTC's annual guidance was "way too aggressive in terms of [its] assumptions" and that Defendants "didn't question enough the assumptions underlying how they were going to get there" and that, in truth, Defendants had "just assume[d] that we were going to continue to see th[e] kind of growth" in commercial aftermarket sales that the Company had seen in prior years. *See supra* at ¶¶ 191-193. No cautionary language accompanying Defendants' statements addressed or disclosed this risk, or the other substantive information that Lead Plaintiff alleges Defendants misrepresented. By failing to disclose that UTC engaged in an unsustainable practice of pulling in future sales into current periods to meet sales goals, any cautionary language accompanying Defendants'

statements concerning UTC's earnings guidance did not address this concealed practice or the specific risks that existed in UTC's ability to meet its guidance.

231. Therefore, Defendants did not provide sufficient information to permit Lead Plaintiff to appreciate the risks associated with their investment in UTC, as Defendants failed to disclose facts critical to appreciating the magnitude of any such risks. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by UTC were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

232. Defendants themselves did not view the generic risk warnings and cautionary language set forth in UTC's SEC filings as being meaningful. Instead, as Defendant Hayes stated during a November 2014 presentation, they referenced such language on conference calls simply to "satisf[y] the lawyers."

233. To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because: (i) the opinion was both objectively false and disbelieved by the defendant at the time it was expressed; (ii) the opinion statement contains an embedded statement of fact, and the supporting fact provided was untrue; or (iii) omits information whose omission makes the statement misleading to a reasonable investor.

## X. CLASS ACTION ALLEGATIONS

234. Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired UTC publicly traded common stock during the period from December 11, 2014 through July 20, 2015, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are: (i) Defendants (as set forth herein); (ii) present or former executive officers and directors of UTC

during the Class Period, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii))); (iii) any of the foregoing entities' and individual's legal representatives, heirs, successors or assigns; (iv) any entity in which Defendants have or had a controlling interest, or any affiliate of UTC; and (v) UTC's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s). For the avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of UTC's employees.

235. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, UTC common stock was actively traded on the NYSE. As of January 31, 2015, UTC had 907,156,995 shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of thousands of members of the proposed Class. Class members who purchased UTC common stock may be identified from records maintained by UTC or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

236. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws that are complained of herein.

237. Lead Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

238. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts;

c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d) whether Defendants acted with scienter; and

e) the proper measurement of damages.

239. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XI. CLAIMS FOR RELIEF UNDER EXCHANGE ACT

### A. FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS)

240. This claim is asserted by Lead Plaintiff on behalf of itself and all other members of the Class against Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

241. In support of this claim, Lead Plaintiff repeats and re-alleges each allegation set forth above as if fully set herein.

242. During the Class Period, Defendants disseminated or approved the materially false or misleading statements alleged herein, among others, which they knew or recklessly disregarded were misleading in that they misrepresented and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

243. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of UTC common stock during the Class Period. As alleged herein, the material misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to the following:

a) Defendants' issuance of FY2015 EPS guidance of $7 to $7.20 per share on December 11, 2014, based in part on "***high single digit***" growth in UTAS;

b) Defendants' statements on January 26, 2015, that "nothing has fundamentally changed in the health of the underlying business" and that "business fundamentals and operational expectations have not changed";

c) Defendants' issuance of revised FY2015 guidance of $6.85 to $7.05 per share on January 26, 2015, to account for a strengthening of the U.S. dollar and pension discount rate headwinds, while confirming that "***business fundamentals and operational***

***expectations have not changed***";

d) Defendants' affirmance of the revised FY2015 guidance of $6.85 to $7.05 per share, on February 18, March 12, March 18, April 21, May 19, and June 4, 2015, which confirmed the Company was on track to meet this guidance, and affirmative misrepresentations that UTC was "on track" or "on the right track" to meet these goals;

e) Defendants' misrepresentations and omissions that commercial aftermarket fundamentals were "strong," that UTAS "should see continued strong commercial aftermarket growth," "operationally, everything [was] as we expected," and that the Company was "confident" and "comfortable" and "fe[lt] good about where we are" with the guidance, and in UTC's ability to meet the same, on March 12, March 18, April 21, May 19, and June 4, 2015;

f) Defendants' misrepresentations and omissions about the purported positive-trending trajectory in Otis and anticipated growth in China based on a purportedly robust and "strong" backlog, despite a slowing property market there, on December 11, 2014, January 26, March 12, March 18, April 21, and May 19, 2015;

g) Defendants' issuance of revised FY2015 EPS guidance of $6.55 to $6.85 per share on June 15, 2015, including $0.10 to $0.20 of one-time separation costs related to UTC's divestiture of Sikorsky, along with a $0.10 decline in Sikorsky's operational expectations for the year due to weakness in the oil and gas markets, while maintaining that it was still on track to meet at least the low end of its EPS guidance.

244. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead

Plaintiff and the Class; (ii) made materially false statements and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of UTC common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other Class members, regarding, among other things, UTC's business condition and financial prospects; (b) artificially inflate and maintain the market price of UTC common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase UTC common stock at artificially inflated prices and to suffer losses when the true facts became known.

245. Defendant UTC is liable for all materially false and misleading statements made during the Class Period, as alleged above.

246. The Individual Defendants are liable for the false or misleading statements they made and for which they were responsible, as alleged above.

247. As alleged above, the Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth. The material misrepresentations and omissions of material facts alleged herein, which presented a danger of misleading buyers or sellers of UTC common stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

248. The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at UTC, give rise to a strong inference that Defendants acted with

scienter in making the materially false or misleading statements alleged above during the Class Period.

249. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for UTC common stock, causing them economic loss, which inflation was removed when the true facts became known. Lead Plaintiff and the Class would not have purchased UTC common stock at the prices they paid if they had been aware that the market price had been artificially and falsely inflated by Defendants' materially false or misleading statements.

250. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases and/or acquisitions of UTC common stock during the Class Period.

### B. FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST THE INDIVIDUAL DEFENDANTS)

251. This claim is asserted by Lead Plaintiff on behalf of itself and all other members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

252. In support of this claim, Lead Plaintiff repeats and re-alleges every allegation set forth above as if fully set herein.

253. During their tenures as officers and/or directors of UTC, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their respective positions of control and authority as officers and/or directors of UTC, each of the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to

engage in the wrongful conduct complained of herein. Each Individual Defendant was able to and did control, directly and indirectly, the content of the public statements made by UTC during the Class Period, including the materially false or misleading statements alleged herein, thereby causing the dissemination of the false or misleading statements and omissions of material facts as alleged herein.

254. In their capacities as senior corporate officers of the Company, and as more fully alleged above in, *inter alia*, ¶¶ 21-25 and 27-31, Defendants Hayes, Johri, Bellemare, Gitlin, and Darnis had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Moreover, Defendants Hayes, Johri, Bellemare, Gitlin, and Darnis were directly involved in providing false information and/or approving the materially false or misleading statements disseminated by UTC during the Class Period. As a result of the foregoing, Defendants Hayes, Johri, Bellemare, Gitlin, and Darnis, as a group and individually, were controlling persons of UTC within the meaning of Section 20(a) of the Exchange Act.

255. As alleged above, UTC violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of UTC and as a result of their own aforementioned conduct, each of Defendants Hayes, Johri, Bellemare, Gitlin, and Darnis is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired UTC common stock. Moreover, as alleged above, during the respective times that the Individual Defendants served as

officers and/or directors of UTC, each of the Individual Defendants was culpable for the material misstatements and omissions made by UTC, as set forth above.

256. As a direct and proximate result of the Individual Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of UTC common stock.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

a) Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such equitable, injunctive, and other relief as the Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

DATED: January 2, 2018

Respectfully submitted,

KESSLER TOPAZ MELTZER
& CHECK, LLP

By: /s/ *Kimberly A. Justice*

Kimberly A. Justice (admitted *pro hac vice*)
Michelle M. Newcomer (admitted *pro hac vice*)

280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7056
Facsimile: (610) 667-7056

*Lead Counsel for the Class*

LABATON SUCHAROW LLP
Jonathan Gardner
Michael Canty
Alec Coquin
140 Broadway
New York, NY 10017
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Liaison Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 2, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

/s/ *Kimberly A. Justice*
Kimberly A. Justice